KFK CORPORATION, Plaintiff-Appellee and Cross-Appellant, *v.* AMERICAN CONTINENTAL HOMES, INC., *et al.*, Defendants-Appellants and Cross-Appellees.

Second District   No. 77-339

Opinion filed April 30, 1979.

Theodore A. Shapero and Don E. Glickman, both of Rudnick & Wolfe, of Chicago, for appellants.

S. Louis Rathje, of Rathje, Woodward, Dyer & Burt, of Wheaton, for appellee.

Mr. PRESIDING JUSTICE GUILD delivered the opinion of the court:

This appeal arises from the sale of a partially completed real estate development located in Wheaton, Illinois. The contract of sale was executed on June 8, 1972, and the sale was closed on July 5, 1972. The development consisted of an area of single-family homes known as Casa Solana and an area of multiple-family condominiums known as Heritage Lake Estates. The seller was KFK, an Illinois corporation which was in the business of developing residential realty in the Du Page county area. The purchaser was American Continental Homes, a Delaware corporation (hereinafter ACH) which was seeking to enter the residential housing market in northern Illinois during 1972. Also involved in the transaction, but solely as a guarantor for the contractural obligations of ACH, was its corporate parent, American Financial Corporation, also a Delaware corporation (hereinafter AFC.)

This litigation began on September 16, 1974, when KFK filed a complaint for specific performance against both ACH and AFC. That complaint alleged that under the provisions of section 3(f)(iv) of the contract of sale the two defendants should be ordered to purchase 46,380 shares of unregistered ACH common stock from KFK for the fixed price of $850,000. The two corporate defendants were represented by the same counsel and, in a joint answer, denied that they had any duty to purchase stock from KFK. In addition, ACH counterclaimed for damages arising from an alleged breach of contractual guarantees by KFK. AFC filed its

own counterclaim for $500,000 in overdue principal on a promissory note, executed by KFK and subsequently held in due course by AFC.[1]

After an extensive bench trial on the conflicting claims of the parties, the trial court entered an order on April 14, 1977, which found as follows:

"A. That the material issues relative to the Complaint for Specific Performance are with the plaintiff, K.F.K. CORPORATION, and against the defendants, AMERICAN CONTINENTAL HOMES, INC. and AMERICAN FINANCIAL CORPORATION.

B. That the material issues relative to the Counterclaim filed by the defendants, AMERICAN CONTINENTAL HOMES, INC. and AMERICAN FINANCIAL CORPORATION, are with the plaintiff, K.F.K. CORPORATION, and against the said defendants.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED by the Court that a judgment be and the same is hereby entered in favor of the plaintiff, K.F.K. CORPORATION, and against the defendants, AMERICAN CONTINENTAL HOMES, INC. and AMERICAN FINANCIAL CORPORATION, and each of them, jointly and severally, in the amount of THREE HUNDRED FIFTY THOUSAND DOLLARS ($350,000.00), together with plaintiff's costs of suit.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Counterclaim filed by the defendants, AMERICAN CONTINENTAL HOMES, INC. and AMERICAN FINANCIAL CORPORATION, and against the plaintiff, K.F.K. CORPORATION, be and the same is hereby dismissed with prejudice."

All three corporations which are parties to this litigation have appealed. ACH and AFC, represented by the same counsel, filed a joint notice of appeal as well as joint appellants' briefs. In those briefs they contend first that KFK was not entitled to specific performance because it had allegedly failed to perform various conditions precedent and, second, that ACH was entitled to damages arising out of alleged breaches of warranty by KFK. In its cross-appeal KFK contends that it should have received statutory prejudgment interest on the purchase price of the stock from the date the stock should have been purchased to the date of judgment.

---

[1]In *K. F. K. Corp. v. American Continental Homes, Inc.* (1975), 31 Ill. App. 3d 1017, 335 N.E.2d 156, this court affirmed a preliminary injunction which restrained the defendants from taking any action affecting the status of the 46,380 shares of ACH stock involved in this action since that stock was collateral for the $500,000 note held by AFC. The issues raised in that opinion have been disposed of and have not been renewed.

We have carefully examined both the arguments of the parties and the record herein. As a result of that examination we conclude that this opinion must be divided into two broad areas of examination. The first is whether the findings of the trial court are beyond the manifest weight of the evidence. The second is whether the relief ordered by the trial court properly reflected the rights, duties and liabilities of the three separate parties as established by the court's findings of fact.

We now turn to the first broad area of examination where we initially examine KFK's claim for the specific performance of a provision contained in the realty sales contract. It is the provisions of that contract which both create and define the scope of relief available to KFK, if any. The specific contractual provisions which are necessary to a proper determination of this point are as follows:

"(f) ACH agrees and American Financial Corporation hereby becomes a party to this Contract for the sole purpose of guaranteeing the commitment of ACH contained in this sub-paragraph 3(f).

(i) If prior to December 31, 1973, ACH has made available to KFK the Registration opportunity set forth in the immediately preceding sub-paragraph and the Registration Statement made available to KFK has become effective prior to said December 31, 1973, and in the further event that the market value of an ACH Common share as of December 31, 1973 (computed in the same manner as sub-paragraph 3(e)) when multiplied by the number of shares of ACH Common Stock issued to KFK under the terms of sub-paragraph 3(e) is less than Eight Hundred Twenty-Five Thousand Dollars ($825,000), then within Ten (10) days after December 31, 1973, ACH or American Financial Corporation as guarantor shall pay to KFK the difference between Eight Hundred Twenty-Five Thousand Dollars ($825,000) and the number of shares of ACH stock issued pursuant to sub-paragraph 3(e) multiplied by the market value of ACH stock on December 31, 1973, as computed in sub-paragraph 3(e); and ACH and American Financial Corporation as guarantor shall have no further obligation to KFK with respect to the ACH shares issued under this Agreement.

(ii) If prior to December 31, 1973, ACH has made available to KFK the Registration opportunity set forth in the immediately preceding sub-paragraoh and the Registration Statement made available to KFK has become

effective prior to said December 31, 1973, and in the further event that the market value of ACH Common Stock on December 31, 1973, (as hereinabove computed) when multiplied by the number of shares of ACH Common Stock issued pursuant to sub-paragraph 3(e) is in excess of Eight Hundred Twenty-Five Thousand Dollars ($825,000), then ACH and American Financial Corporation as guarantor shall have no further obligations to KFK with respect to the ACH Stock issued hereunder.

(iii) If on December 31, 1973, the Registration hereinabove referred to in this sub-paragraph 3(f) has not been made available to KFK, or has not become effective, then KFK shall have the right to require ACH or American Financial Corporation as guarantor to pay to KFK the difference between the number of ACH Common shares issued to KFK under the terms of sub-paragraph 3(e) multiplied by the market value of ACH Stock on December 31, 1973 (as hereinabove computed) and the sum of Eight Hundred Twenty-Five Thousand Dollars ($825,000) within Ten (10) days after December 31, 1973; and upon the payment of said amount, ACH and American Financial Corporation as guarantor shall have no further obligation to KFK with respect to the ACH shares issued hereunder.

(iv) In the event that KFK fails to exercise the right given to it under the provisions of the immediately preceding paragraph 3(f), then KFK shall have the right after July 5, 1974, and prior to July 15, 1974, to elect either (aa) to retain its ACH shares owned by it on July 5, 1974, or (bb) to dispose of said shares; and in the latter event, KFK shall undertake, utilizing all reasonable efforts, to dispose of so many of the ACH Common shares as may be sold by it in conformity with the provisions of the Securities Act of 1933 and for the market price of such shares then prevailing, and if all of said shares are not so disposed of, then within Ten (10) days after September 5, 1974, ACH or American Financial Corporation as guarantor agrees that it shall purchase, if offered to it by KFK, the ACH stock which KFK has theretofore been unable to dispose of in accordance with this paragraph for the purchase price which shall be the difference between the net proceeds of the ACH stock which KFK has theretofore dispose of, either during said period after July 5, 1974, or prior thereto, and Eight

Hundred Fifty Thousand Dollars ($850,000). KFK shall notify ACH in writing prior to July 16, 1974, of its choice as to the options available to it during the period of July 5, 1974, and July 15, 1974."

These provisions by themselves, however, are meaningless without an understanding of the actions of the parties herein. An examination of the record reveals these pertinent facts: 1. The contract of sale was drafted by legal counsel for the defendant ACH and KFK had no input into the wording of the provisions set forth above. 2. The 46,380 shares of ACH stock were never registered by ACH with the Securities and Exchange Commission, although the parties clearly anticipated such registration at the time of contract. 3. KFK never exercised its right to recover the stock's value guaranteed under subparagraph 3(f)(iii). 4. In a letter dated July 5, 1974, KFK clearly notified both ACH, and AFC as guarantor, that it intended to dispose of its ACH stock under the provisions of subparagraph 3(f)(iv)(bb) of the contract. 5. Legal counsel for KFK requested in writing on at least two occasions during July 1974 that ACH disclose the registration status of the stock so that KFK might properly proceed in disposing of it pursuant to the contract. Both of these requests were ignored by ACH. 6. The actual stock certificate concerned herein bore a legend reciting that the stock had been acquired by KFK solely as an investment, thus becoming "lettered" or "legend" stock. 7. The testimony of a stock broker, Mr. Hudson Worth, revealed that such lettered stock could only be disposed of by a broker and that his own brokerage firm would not handle such a sale unless the legend were removed by the issuing corporation, that is to say, ACH. It was also revealed that KFK contacted Mr. Worth, the stock broker, during the summer of 1974 and that he informed them that there was essentially no market for the unregistered ACH stock. 8. Neither ACH or AFC made any attempt whatsoever to aid KFK in disposing of the stock, either by removing the legend or suggesting a purchaser. In fact there is evidence that ACH did not wish the stock sold on the open market since the sale of such a large block would depress the value of the ACH stock. 9. KFK failed to sell any of its ACH stock prior to September 5, 1974. 10. In a letter dated September 4, 1974, and sent to both ACH and AFC, KFK tendered the 46,380 shares of ACH stock which it had acquired under the sales agreement. That same letter also contained a demand for the full purchase price of $850,000 called for by the contract since none of the shares had been sold previously.

■■ Based on the strict wording of the contract, the facts in the record and the arguments of the parties, it is clear that the sole issue controlling the claim for specific performance is whether KFK adequately performed all the conditions precedent required of it. After a careful review and

analysis, we are of the opinion that it has. The threshhold condition of subparagraph 3(f)(iv), namely that KFK had not exercised the proceeding options open to it under paragraph 3(f), was clearly met. Subparagraph 3(f)(i) and 3(f)(ii) were unavailable to KFK since the stock was never registered; and KFK never elected recovery of guaranteed value from either ACH or AFC under the provisions of paragraph 3(f)(iii). KFK's letter of July 5, 1974, establishes that KFK did not elect to retain its ACH shares under subparagraph 3(f)(iv)(aa) but chose the option of disposal available to it under subparagraph 3(f)(iv)(bb). And, as the last sentence of paragraph 3(f)(iv) requires, KFK notified ACH in writing, prior to July 16, 1974, of its election. Next, we face the question of whether KFK utilized all "reasonable efforts" to dispose of some or all of its ACH stock. As the briefs and arguments of the parties contend, it is the interpretation of the term "reasonable efforts" which controls. Due to the clearly divergent positions of the parties, and supported by our own reading of the contract, we are forced to conclude that this provision is ambiguous. The law of this State requires its courts, in any interpretation of contractual ambiguity, to attempt to give a reasonable effect to all of the contract's parts and, if necessary, resolve any ambiguity most strongly against its author. (See *Bost v. Paulson's Enterprises, Inc.* (1976), 36 Ill. App. 3d 135, 343 N.E.2d 168; *Heifner v. Board of Education* (1975), 32 Ill. App. 3d 83, 335 N.E.2d 600.) Relying on these principles, we observe that in all the subparagraphs of paragraph 3(f) except subparagraph 3(f)(iv), reference is made to whether the ACH stock has been registered with the Securities and Exchange Commission. Since the registration status of the stock made some difference to KFK's options of disposition, we have examined, and take judicial notice of, the rules and regulations of the Securities and Exchange Commission concerning registered and unregistered stock. An analysis of those rules is clearly beyond the competency of this court and we will make no attempt to either interpret or summarize them. However, our examination reveals to us that registered stock may generally be sold or disposed of through a broker who solicits purchasers on the open market without exposing the seller to either difficulty or liability. Unregistered stock, on the other hand, may be disposed of only through a broker (who may not solicit potential purchasers) and only then if the sale meets certain very strict requirements. In addition, the seller may become an "underwriter" and thus becomes a guarantor of the value of the stock and be exposed to both Federal criminal liability and a civil suit by the purchaser of the stock. (See sections 2(11), 4, 5 and 12, Securities Act of 1933, 15 U.S.C. §§77a-77aa (1976) and Rule 144 thereunder, 17 C.F.R. 230.144.) While our interpretation of the Federal securities rules may be oversimplified, it is absolutely incontrovertible that one seeking to dispose of unregistered

stock is in a much more difficult and vulnerable position than one seeking to dispose of registered stock. In the light of that substantial difference, we hold that "reasonable effort" referred to in paragraph 3(f)(iv)(bb) cannot in good faith require that KFK become an "underwriter" and expose itself to such extensive potential liability without an express agreement to that effect included in the contract. Bearing in mind these facts and circumstances, and construing subparagraph 3(f)(iv)(bb) most strictly against its authors, we find that the facts support a finding that KFK utilized "all reasonable efforts" to dispose of its ACH stock and thus fulfilled that condition precedent.

█ We note next that in the letter dated September 4, 1974, and signed by KFK's president, a paragraph was included which purported to tender the stock involved here to the defendants under the provisions of the contract. We note in this regard that the contract is silent insofar as the specific requirements for the tender of the stock are concerned. In the light of this silence we hold that the action of KFK in making the tender by letter without the physical presence of the stock was more than adequate to trigger the contractural obligations of ACH and/or AFC, as guarantor. Finally, since KFK still possessed its stock as of September 5, 1974, and there had been no partial sale of the ACH stock held by KFK, then ACH was bound to purchase that stock for the stated price of $850,000. We note at this point, however, that AFC was only a guarantor for ACH's obligation and would only become liable under this contract if it could be shown that ACH could not perform.

█ Based on the foregoing analysis, we hold that the trial court correctly found the merits of KFK's counterclaim to lie with the plaintiff and therefore an order of specific performance should properly have been entered. We will deal with the specific wording of that order at a later point in this opinion.

█ We now turn to the merits of ACH's counterclaim against KFK for the breach of alleged guarantees made by KFK regarding the anticipated costs of completing the housing developments purchased by ACH. The contractural provisions upon which ACH relies are as follows:

"(c) KFK represents to ACH that it has entered into a contract or contracts for land development of Lot No. 103, including but not necessarily limited to streets, mass grading, sewer, curbing, and that such contract provides for the completion of land development, exclusive of landscaping, trees, final grading, clubhouse, swimming pool, and the erection of the residence units in the Development for a cost of Five Hundred Twenty-Eight Thousand Dollars ($528,000), and KFK represents that such land development can be completed according to plans within the cost figure of Five Hundred Twenty-Eight Thousand Dollars, ($528,000); provided,

however, that such representation as to completion costs is subject to contract provisions relative to price deviations arising out of conditions other than those set forth in the specifications.

(d) Attached hereto as Exhibit 'E' are KFK's cost sheets for its single-family and multi-family dwelling units. KFK represents to ACH that such cost sheets fairly represent its costs in erecting the respective dwelling units on May 31, 1972, and subject to minor adjustments and to labor and material increases occurring thereafter, the respective dwelling units can be constructed to completion within the costs set forth on the cost sheets if built according to standard specifications."

We are of the opinion that a detailed recitation of the facts relating to this claim is unnecessary. It suffices to say that ACH contends that the preceding contractual provisions created a warranty flowing from KFK to ACH that the contemplated developments to the realty, both condominium and single-family, could be completed with the cost estimates of KFK. We have examined the contract and the evidence introduced by the parties and we conclude that no such warranty, either express or implied, existed. At the very most it could be said that certain representations were memorialized in the contract but it is quite clear that KFK afforded ACH and its employees every opportunity to verify the accuracy of these representations prior to the closing of the sale. In fact, KFK specifically allowed the representatives of ACH to examine any and all documents concerning the realty involved in the sale, including all price sheets, books and estimates. Furthermore, the record reveals that most or all of the cost overruns encountered by ACH arose from the existence of certain poor soil conditions in the subject realty. The record shows that, but for those soil conditions requiring special means of construction, these overruns probably would not have occurred. We note that nowhere in the contract did KFK ever specifically warranty the subsurface conditions at the construction site. In fact, KFK allowed ACH free access to the site to test the soil while the contract negotiations were still going on. Regardless of the results of those tests, which apparently indicated problems, ACH elected to draft the contract without including a warranty of soil conditions. At best, the existence of a warranty by KFK is ambiguous. Accordingly, we hold that the finding of the trial court denying the merits of ACH's counterclaim was correct and should be affirmed.

■■ We turn now to the issue of whether the trial court erred in finding for KFK with regard to AFC's counterclaim for judgment on the $500,000 note executed by KFK and purchased by AFC from the Union Commerce Bank of Cleveland, Ohio, which had held the note prior to September 1974. The issue is simply whether AFC is entitled to judgment

on that note. The record reveals that AFC introduced the note into evidence and it is undisputed by the parties that although KFK paid all interest due on this note until September 1974, it had failed to pay the $500,000 in principal. In fact, the witnesses for KFK all indicate that KFK acknowledged the existence of the debt and had directed that $500,000 of the proceeds of the sale of the ACH stock be directed to the payment of this debt. Therefore, we must conclude that the trial court's finding for KFK upon the merits of AFC's counterclaim, which was based solely on the note, is beyond the manifest weight of the evidence and must be reversed.

We now turn to the second broad area of examination set forth above, *i.e.*, whether the trial court's order properly reflected the rights, duties and liabilities of the parties. In this area we must first consider the cross-appeal of KFK which contends that it was entitled to prejudgment interest upon the purchase price for the stock, pursuant to the provisions of section 2 of the Interest Act (Ill. Rev. Stat. 1975, ch. 74, par. 2), which reads in pertinent part as follows:

"Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; * * *."

■■ ■ In its brief and at oral argument, KFK contended that a debtor-creditor relationship as to a fixed or readily determinable sum, was created by the June 8, 1972, contract, which was an instrument in writing. ACH and AFC have countered with the contention that the existence of a "good faith dispute" between the parties as to both the existence and the amount of the alleged debt makes such prejudgment interest inappropriate. The issue thus presented is whether the absence of a good faith dispute between the litigants is a necessary element to the award of prejudgment interest to a creditor who is due a fixed or readily determinable sum arising from a note or other instrument in writing. This particular issue has arisen and has been dealt with by this court in the case of *Haas v. Cravatta* (1979), 71 Ill. App. 3d 325, 389 N.E.2d 226, filed contemporaneously with this opinion. In *Haas* we analyze the divergence of opinions between the courts of the various districts regarding the impact of good faith disputes on statutory interest. We held there that the existence of a good faith dispute only affects that portion of section 2 of the Interest Act which relates to "unreasonable or vexatious delay" and that it has no applicability to cases involving instruments in writing, such as contracts for the sale of realty. Based on the rationale expressed in *Haas*, we hold that KFK is entitled to 5% statutory interest on the $850,000 owed it, running from September 16, 1974 (the last date which it had to purchase the stock under the contract), to the date of final judgment in this case.

Finally, we note that the judgment of the trial court does not properly take into account the relationship between the parties resulting from the findings on the merits.

KFK's claim was solely for specific performance and not for damages. As the successful litigant in such a case, it was entitled to the full, contractural sales price, plus interest. However, in its turn, it must balance the transaction by transferring its interest in the ACH stock to that defendant who actually purchases it.

■■ Similarly, as we have noted above, AFC was a separate party to this action and was entitled, without question, to judgment upon the $500,000 defaulted note executed by KFK. It is indisputable that the rights of AFC to recovery under the note are independent of any obligations AFC might have to KFK as a guarantor and not a surety under the contract, and we hold that it was improper for the court to use the sum due on the note as a setoff for ACH's primary obligations to KFK. We note parenthetically here that AFC never claimed the 10% per annum interest which the terms of the note call for after maturity. In fact, in this proceeding AFC specifically and consistently only sought the payment of the principal, thus waiving any claim to interest under the note.

In conclusion, we find that the relief mandated by the judgment order entered by the trial court is erroneous under the facts of this case and must be reversed. Therefore, although we have partially affirmed the trial court on the merits, we must reverse and remand this cause for the entry of a new order, requiring:

A. ACH to pay KFK $850,000, plus 5% per annum interest from September 16, 1974, to the date of judgment.

B. AFC to hold itself ready to assume the liability of ACH upon a showing that ACH cannot pay the sum required by A.

C. KFK to pay to AFC the sum of $500,000 in principal on the defaulted note.

D. AFC to release to KFK the 46,380 shares of ACH stock which it was holding as collateral on the note.

E. KFK to transfer the 46,380 shares of ACH stock to whichever of the defendants pays the amount called for in A.

For the reasons set forth above, this case is affirmed in part, reversed in part and remanded with directions.

Affirmed in part; reversed in part and remanded with directions.

LINDBERG and NASH, JJ., concur.