ALLSOPP SAND & GRAVEL, INC., Plaintiff-Appellee, v. LINCOLN SAND & GRAVEL COMPANY, Defendant-Appellant.

Fourth District   No. 4—87—0731

Opinion filed June 30, 1988.

Harris & Harris, of Lincoln, for appellant.

William O. Martin, Jr., Darrell A. Woolums, and Martin D. Hoke, all of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Plaintiff Allsopp Sand and Gravel, Inc. (Allsopp), filed suit in the circuit court of Logan County alleging defendant, Lincoln Sand and Gravel Company (Lincoln), failed to pay for the balance of sand due under an existing contract. The trial court rendered a verdict for Allsopp and entered judgment against Lincoln in the amount of $45,240.36. Lincoln appeals and we reverse.

The two parties in this action are competitors in the sand and gravel business. John and Jay Owensby, father and son, own and operate Allsopp. In the spring of 1986, when Lincoln's dredge became inoperable, one of Lincoln's owners, Paul Robert Orr (Orr), approached the Owensbys and offered to purchase sand from Allsopp so Lincoln could meet its customers' needs for the upcoming construction season.

The parties entered into a contract in March of 1986 wherein Allsopp agreed to supply and Lincoln agreed to purchase 50,000 tons of FA—1 specification sand for $1.20 per ton. The contract stipulated the

volume requirement would be waived if the sand was not of FA–1 quality. Lincoln agreed to pay the balance due under the contract by December 31, 1986, and to take delivery of the remaining tonnage of sand by the spring of 1987. The sand was to be loaded out to Lincoln's trucks during Allsopp's regular business hours (7:30 a.m. to 3:30 p.m., Monday through Friday) and during the regular operating season (March through November). Loading out at other times was to be by "special arrangements."

During March and April of 1986, Lincoln took delivery and paid $14,759.64 for 12,299.7 tons of Allsopp sand. The balance due under the agreement, $45,240.36, was not paid by December 31, 1986. On February 19, 1987, Allsopp filed its complaint in the circuit court of Logan County for breach of contract and asked for judgment against Lincoln in the amount of the contract balance.

Lincoln filed an answer containing general denials and affirmative defenses. Lincoln alleged Allsopp (1) did not supply sand of the quality specified in the contract and (2) wrongfully refused to make "special arrangements" to load out sand at the original contract price before the contract expired, but at a time outside Allsopp's regular operating season.

The evidence presented at the bench trial was as follows.

Lincoln returned six loads of sand to Allsopp on March 31, 1986, because the sand contained mud. Allsopp gave Lincoln credit for the loads and paid for the cost of the return trucking. Lincoln continued to take deliveries from April 1 through April 18, 1986, without complaint. Allsopp's sandpit closed for the season on November 26, 1986.

Jay Owensby testified that Orr contacted him the second week in December of 1986 and requested to load out the remaining sand due under the contract. Jay told him the pit was closed and he did not have the manpower to load out at that time. Jay said Lincoln would have to pay 25 to 30 cents more per ton to load the sand in December.

Orr then called the elder partner, John Owensby, and the two attempted to negotiate a special arrangement. John testified he told Orr they would have to charge Lincoln extra for a load out in December because Allsopp would have to recall employees and pay them at union wage. Orr offered to pay five cents more per ton and to supply one of Lincoln's employees to facilitate the loading process. The Owensbys refused the offer. During a subsequent conversation in the latter part of January 1987, Orr told Owensby Lincoln did not intend to pay for the balance of the sand due under the contract.

Allsopp's expert, Loren Bloome, from the Illinois Highway De-

partment, testified he tested Allsopp's sand on 47 different occasions during 1986. Each test result showed the sand met FA—1 specifications.

The trial court found Allsopp had acted in a commercially reasonable manner and had performed all conditions required of it under the contract. Lincoln was found to have waived rejection of the parties' agreement when it took delivery of Allsopp's sand after discovering certain loads were contaminated. The court held the evidence sufficiently established Allsopp had supplied FA—1 specification sand and that Lincoln's request to load out sand in December, outside Allsopp's regular operating season, was commercially unreasonable. Allsopp's damages were computed at $45,240.36.

■ It is a question of fact whether a contract has been performed according to its terms, and the trial court's determination will not be disturbed unless it is against the manifest weight of the evidence. (*Ralph v. Karr Manufacturing Co.* (1974), 20 Ill. App. 3d 450, 314 N.E.2d 219.) From the record and oral argument before us, we find not only did the trial court miscalculate the damages, but its entire judgment in favor of Allsopp was against the manifest weight of the evidence.

■ We first address the issue of damages. Section 2—708 of the Uniform Commercial Code contains the formula to compute a seller's damages caused by a buyer's nonacceptance or repudiation. Section 2—708(1) provides:

> "(1) *** [T]he measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages ***, *but less expenses saved in consequence of the buyer's breach.*" (Emphasis added.) Ill. Rev. Stat. 1985, ch. 26, par. 2—708(1).

The statute clearly directs that the trial court, when it computed damages, should have subtracted from the unpaid contract price the amount Allsopp saved in loading expenses as a result of the severed agreement. Failure to utilize the above formula put Allsopp in a better position than it would have occupied had there been no breach of contract. *Central Information Financial Services, Ltd. v. First National Bank* (1984), 128 Ill. App. 3d 1052, 471 N.E.2d 992.

In addition, we are unable to determine from the record the market price of the sand. We are also unable to determine whether the trial court's order contemplates that Allsopp not only recovers damages but also retains the sand. The trial court's order appears to require Lincoln to pay damages based on the contract price for the

sand, but gives no credit for any expenses saved by Allsopp or for Allsopp's ability to sell the sand to another buyer at market price.

■ A party suing for breach of contract must prove he substantially complied with the material terms of the agreement attributable to him. (*George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.* (1975), 32 Ill. App. 3d 249, 336 N.E.2d 185.) After careful consideration of the contract language and the contents of the record, we conclude Allsopp was the breaching party in this case and is not entitled to any damages.

■ The dispositive issue on review is whether Allsopp's refusal to make special arrangements to load out sand in December at the original contract price was commercially reasonable. The trial court is the initial determiner of commercial reasonableness. (Ill. Rev. Stat. 1985, ch. 26, par. 1—204(2); *GNP Commodities, Inc. v. Walsh Heffernan Co.* (1981), 95 Ill. App. 3d 966, 420 N.E.2d 659.) However, a reviewing court may overturn the trier of fact's finding if, after viewing the evidence in the aspect most favorable to the prevailing party, it appears the determination was clearly improper. *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.* (1986), 114 Ill. 2d 133, 500 N.E.2d 1.

The trial court found it was commercially reasonable for Allsopp to refuse to make special arrangements with Lincoln in December absent an increase in price. Lincoln's request to load out at that time and at the original contract price was held to be both unreasonable and untimely. Our interpretation of the term "special arrangements" leads us to the conclusion the trial court's finding was against the manifest weight of the evidence, even as viewed in a light most favorable to Allsopp.

In pertinent part the contract provides:

"The volume requirement shall be waived · should Allsopp Sand & Gravel, Inc. captures [*sic*] Lincoln Sand & Gravel Co.'s major customers or if sand does not meet the FA—1 specification. If Lincoln Sand & Gravel Co. does not take the 50,000 tons by 31 December 1986, they agree to pay Allsopp Sand & Gravel, Inc. the balance at the rate of $1.20 per ton and take the sand in the spring of 1987.

\* \* \*

Allsopp Sand & Gravel, Inc. shall load out sand during regular business hours (7:30 a.m. to 3:30 p.m.—Monday thru Friday) and during the regular operation season (March thru November). Special arrangements can be made for load outs at other times."

■ First, we must determine whether a price increase is inherent

in the term special arrangements. A contract for goods will not be held invalid for indefiniteness just because certain details of performance are not spelled out in the contract. (Ill. Rev. Stat. 1985, ch. 26, par. 2—311(1); Ill. Ann. Stat., ch. 26, par. 2—311, Uniform Commercial Code Comment, at 209 (Smith-Hurd 1963).) Section 2—311(1) applies only when the sales contract is "otherwise sufficiently definite." Ill. Rev. Stat. 1985, ch. 26, par. 2—311(1).

Lincoln maintains the contract is indefinite and ambiguous due to the special arrangements language. Accordingly, Lincoln argues this court should construe the problem term in the context of the preceding language referring only to time, not price.

██ █ Due to the clearly divergent positions of the parties', the trial court's, and our own reading of the contract, we are compelled to conclude that the special arrangements language is ambiguous. When interpreting contractual ambiguity, this court "[must] attempt to give a reasonable effect to all of the contract's parts and, if necessary, resolve any ambiguity most strongly against its author." *KFK Corp. v. American Continental Homes, Inc.* (1979), 71 Ill. App. 3d 304, 311, 389 N.E.2d 232, 237, *cert. denied* (1980), 445 U.S. 904, 63 L. Ed. 2d 320, 100 S. Ct. 1081.

The distinction between Allsopp's seasonal operating hours and its load out hours is critical to our interpretation of the contract. Seasonal hours are governed by the calendar (March through November) and load out hours depend only on material availability. The record and oral argument revealed Allsopp had 30,000 tons of sand already stockpiled on its premises when Lincoln requested delivery in December. Allsopp argues that its season closed in November. This gives added importance to "special arrangements" as Allsopp, by the contract, agreed to deliver sand until December 31, 1986.

██ We do not believe the cost of load out in December was such as to permit Allsopp to alter the terms of the contract by increasing the price per ton. Since the original price quoted to Lincoln included overhead costs, it was commercially unreasonable for Allsopp to charge more to make the special arrangements requested by Lincoln.

Next, we consider whether Lincoln's request for special arrangements was untimely because it was made after Allsopp's 1986 operating season was complete.

The contract itself was to expire on December 31, 1986, regardless of the operating season. Lincoln's request for a special load out was made on December 5, 1986, a date well within the contract's lifetime. There is nothing in the contract language which intimates that the making of such a request was allowed only during the regular op-

erating season. Lincoln's request was not untimely given the language of the contract.

We conclude it was against the manifest weight of the evidence for the trial court to conclude Allsopp had performed its contract with Lincoln according to terms. Our holding releases Lincoln from all liability on the contract.

Accordingly, we need not address the remaining complained-of errors.

For the foregoing reasons, the order of the circuit court of Logan County is reversed.

Reversed.

McCULLOUGH and SPITZ, JJ., concur.