128 Ill. App.3d 1052 (1984)
471 N.E.2d 992
CENTRAL INFORMATION FINANCIAL SERVICES, LTD., Plaintiff-Appellee,
v.
THE FIRST NATIONAL BANK OF DECATUR, Defendant and Third-Party Plaintiff-Appellant (North American Financial Services, Ltd., Third-Party Defendant-Appellee).
No. 4-83-0732.
Illinois Appellate Court  Fourth District.
Opinion filed November 26, 1984.
*1053 Vernon H. Houchen, of Decatur, for appellant.
John E. Fick, of Samuels, Miller, Schroder, Jackson & Sly, of Decatur, for appellee North American Financial Services, Ltd.
James Walker, Ltd., of Bloomington, for other appellee.
Reversed and remanded.
JUSTICE GREEN delivered the opinion of the court:
This complex civil litigation arises from a written contract entered into between third-party defendant, North American Financial Services, Ltd. (North American), and defendant, the First National Bank of Decatur (Bank), on July 27, 1979. By the terms of the contract, the Bank agreed to purchase and North American agreed to supply certain data processing software services and supplies. The document also provided that North American would convert the Bank's current data processing arrangement to that described in the contract. On the same date, with the Bank's written consent, North American assigned its rights in the contract to its wholly owned subsidiary, plaintiff, Central Information Financial Services, Ltd. (Central).
On December 26, 1979, Central filed suit in the circuit court of McLean County against the Bank alleging a breach of the contract and seeking money damages. On March 6, 1980, the venue was transferred to the circuit court of Macon County pursuant to a Federal statute which limits the venue in which civil actions may be brought against national banking associations, such as the Bank, to the trial court of the locality wherein the bank is located. (12 U.S.C.A. sec. 94 (West Supp. 1945).) Subsequently, the Bank filed (1) an answer including an affirmative defense, (2) a counterclaim against Central, and (3) a third-party complaint against North American. The latter then counterclaimed against the Bank. During the jury trial, North American's counterclaim was withdrawn. The circuit court entered judgment on verdicts (1) finding in favor of Central on the original complaint and awarding damages in the sum of $300,000, (2) finding against the Bank on its counterclaim against Central, and (3) finding in favor of *1054 North American on the third-party complaint.
The Bank has appealed maintaining, inter alia, that actions of Central's counsel deprived it of a fair trial. We agree. The matters before the jury were complicated, and the Bank was entitled to have its evidence and arguments considered without the influence resulting from improper remarks concerning matters outside the record. Although the conduct of counsel for North American was entirely proper, we conclude that the remarks of Central's counsel also prejudiced the Bank with respect to its dispute with North American. Considering also the contractual and other relationships between Central and North American, we find fairness to require that a new trial be granted as to all claims between all parties. We will discuss other claims of error to the extent necessary to render assistance in the rulings to be made upon remand.
Before discussing the point upon which reversal is granted, further explanation of the issues before the trial court is necessary. The complaint alleged that after Central had made extensive and expensive efforts to prepare to perform the contract, an anticipatory breach of the contract occurred when the Bank informed Central that the Bank would not proceed with the contract. In its answer, the Bank admitted that it had elected not to proceed under the contract, but maintained it had done so because of breaches by Central. The Bank's affirmative defense, its counterclaim, and its third-party complaint alleged that, after the complaint was filed, the three parties had met and orally agreed to resolve the disputes pursuant to a document which had been reduced to writing but never signed by any party. The pleading asserted that the agreement required North American to complete the work, but that North American had failed to do so.
A copy of the document referred to in the affirmative defense, counterclaim and third-party complaint was attached to the Bank's pleadings. It purported to make various minor changes in the terms of the contract and its pricing arrangements. The document also provided that upon its execution (1) Central would reassign its contractual obligations under the July 1979 contract to North American, and (2) the Bank would pay Central $14,351.37 as reimbursement for expenses which Central had incurred in attempting to convert the Bank's data processing system. It also contained a schedule of dates for the conversion of the Bank's data processing system. Under the purported terms of the document, Central agreed that after the Bank's data processing system was converted to the North American system, Central would dismiss its case against the Bank.
Much of the evidence was undisputed. Apparently, a disagreement *1055 arose between the parties, and in the late fall of 1979 agents of the Bank told agents of the other parties that the Bank considered the contract to be terminated because of Central's failure to perform. Then, on December 17, 1979, the Bank's counsel sent Central's counsel a letter stating in part:
"We believe that your clients have breached the agreement between the parties by reason of inability to perform under the terms thereof.
* * *
[Y]ou are advised that [the Bank] considers the matter at an end (except as to claims for damages that it might pursue), and, therefore, this letter is to give you and your client and, by copy, to North American notice of termination of the contract."
The Bank does not dispute that the evidence at trial was sufficient to support a determination that it had breached the contract, but contends that the court erred in prohibiting it from introducing evidence that would have enabled it to show that matters occurring after the letter of December 17, 1979, and the filing of the complaint sufficiently proved the allegations of its affirmative defenses, counterclaim and third-party complaint.
The situation giving rise to the Bank's complaint about the conduct of Central's counsel started during a recess in the trial, when the court held a preliminary conference on instructions. Central offered Illinois Pattern Jury Instruction, Civil, No. 5.01 (2d ed. 1971), which, as drafted, concerned the failure of the Bank to call Bruce McKenzie as a witness. McKenzie was purportedly an expert witness on the conversions of data processing systems. Later, before the jury, Central called the Bank's sole counsel, Vernon Houchen, as a witness. Central's purpose was to support the giving of the instruction by showing that McKenzie had knowledge of the attempts that were made to convert the Bank's data processing system and was closely connected with the Bank. Mr. Houchen's objections to the testimony were overruled, and Central asked him some 15 questions concerning his relationship with McKenzie. The trial court refused to give the tendered instruction, explaining that no showing had been made that McKenzie was either under the Bank's control or more accessible to one side than the other.
In closing arguments, Central's counsel stated:
"Then we remember the testimony of Bruce McKenzie. He is the expert witness that didn't testify. He is the person who the bank contacted to come and tell us that [Central] * * *."
*1056 The Bank objected to this argument, the trial court overruled the objection, and Central's counsel continued as follows:
"[McKenzie] is the person the [Bank] contacted to come and tell us that [Central] didn't have the power, whether its manpower or equipment or whatever, to process this contract. But he is the person who didn't testify. And I think all of you know what inference to draw from that."
The Bank again objected and moved that the remarks be stricken from the record. The court sustained the objection, but did not order the remarks stricken.
During the Bank's closing argument, its counsel advised the jurors that (1) he was embarrassed by being called to the witness stand, and (2) although he knew that the jurors didn't care about a lawyer's being embarrassed, they surely had a sense of what was right and wrong and what was fair play. Central's counsel objected to this statement. The trial court then sustained the objection and struck the remark from the record. Then, in rebuttal closing argument, Central's counsel said:
"Now Mr. Houchen said there was something improper with my calling him as a witness. I called him as a witness to show one thing and that is that he announced he would call Bruce McKenzie as an expert witness and he chose not to do that."
After the Bank's objection to the foregoing was sustained, Central's counsel then said:
"Then I called Mr. Houchen to show whatever his testimony showed. And he says there is something improper with that. There is absolutely nothing unethical about me calling Mr. Houchen as a witness."
The trial court again sustained the Bank's objection, and Central's counsel then stated, "[W]ell, Mr. Houchen brought it up, Your Honor."
After the trial court advised Central's counsel that he had sustained the Bank's objection and stricken the remarks from the record, Central's counsel stated:
"Mr. Houchen says it is embarrassing to him. I did not mean to embarrass him in the slightest. And I don't hesitate to say that Vernon Houchen is a skillful defense lawyer. He is good at his work. And one of the good things he did in this case is deciding not to call Bruce McKenzie to the stand because I took his deposition * * * and I know what his testimony would be."
After the Bank's objection was sustained, Central's counsel stated, "[I]t's a credit to him that he made the decisions that he did in that *1057 regard."
Only very unusual circumstances justify the calling of opposing counsel as a witness, but we need not rule upon the propriety of its occurrence here. The prejudice, if any, to the Bank was slight. Our concern is with the argument of Central's counsel. In ruling on Central's tendered instruction concerning the inference to be drawn because the Bank had not called McKenzie, the trial court ruled that the foundation proof was insufficient to give rise to the required inference. Nevertheless, Central's counsel argued to the jury that an inference could be drawn and implied that the inference would be against the Bank. Then, after responding to Mr. Houchen's argument that Central's counsel improperly called him, Central's counsel told the jury that he knew the contents of the testimony McKenzie gave in a deposition, again implying that McKenzie's testimony would be unfavorable to the Bank.
 1 Thus, Central's counsel's argument not only improperly implied that the jury could draw inferences which the court had ruled to be unsupported, but also implied personal knowledge of the existence of facts not before the jury. (Mileur v. Briggerman (1982), 110 Ill. App.3d 721, 442 N.E.2d 1356.) This portion of counsel's argument, although stated in response to Mr. Houchen's argument that he was improperly called, was not invited by that argument and was not a proper response to that argument. The trial court sustained objection to the cited portion of Central's argument, but that did not seem to deter Central's counsel. The sustaining of the objections was insufficient to negate the prejudicial impact of the improper portions of Central's argument. The argument "seriously jeopardized" the Bank's opportunity to get a fair consideration by the jury of the complicated factual situation before the jury. (Vujovich v. Chicago Transit Authority (1955), 6 Ill. App.2d 115, 120, 126 N.E.2d 731, 735.) For this reason, a new trial is required.
 2 A major dispute concerning the admissibility of evidence will likely arise on retrial. On the first day of the trial, Central filed a motion in limine seeking to prohibit the Bank from communicating to the jury that (1) the parties entered into a written agreement "modifying the agreement dated July 27, 1979," and (2) the parties entered into the agreement referred to in the Bank's counterclaim against Central and its third-party complaint against North American. The trial court allowed the motion, basing its ruling upon the Statute of Frauds provision invalidating contracts "not to be performed within the space of one year from the making thereof" unless in writing and signed by "the party to be charged" (Ill. Rev. Stat. 1979, ch. 59, par. *1058 1). Neither Central nor North American had pleaded the Statute of Frauds but Central, in arguing the motion in limine, had stated that it intended to amend its pleadings to formally raise the issue. The Bank concedes that the issue was properly raised.
Later, when the Bank was cross-examining John Oberding, a principal owner of North American, concerning various conversations he and another owner had with certain Bank officers, Central objected on the basis of the Statute of Frauds and the ruling on the in limine motion. However, the court overruled the objection, stating that the evidence was admissible under the "resolution of problems" paragraph of the July 1979 contract. Paragraph 26(E) of the July 1979 contract provides that "[Central] and [the Bank] agree to cooperate and negotiate in good faith to resolve any problems in connection with any Conversion hereunder." Then, in an answer to a question by Bank's counsel, Mr. Oberding stated that all of the parties had an agreement in principle to go forward and resolve the dispute, and all parties had cooperated until further problems developed in June of 1980.
Still later, after various witnesses had testified concerning the parties' attempts to resolve their differences in the first months of 1980 and North American's attempts to convert the Bank's data processing system in June 1980, Central again objected to the introduction of such evidence. Central argued that the July 1979 contract was terminated by Decatur's anticipatory repudiation of the contract in late 1979, and any evidence of negotiations or attempts to resolve the parties' disputes after the repudiation was not relevant to determining the only issue in the case  the rights of the parties at the time of Decatur's repudiation. Before ruling on Central's objection, the trial court considered the previously mentioned letter of December 17, 1979, written by the Bank's counsel to Central's counsel. The court concluded that (1) as a matter of law, the letter constituted a termination of the July 1979 contract, and (2) accordingly, consideration of any evidence of further negotiations leading to a new oral contract between the parties would violate the Statute of Frauds. The Bank then made an offer of proof as to the evidence it would introduce concerning a subsequent agreement between the parties. Ultimately, the court permitted the Bank to introduce this evidence, but only for the limited purpose of showing whether Central had the ability to perform on the contract at the time of the repudiation. The court prohibited introduction for any other purpose. Subsequently, the trial court permitted the Bank to amend its pleadings to allege that the parties had resolved their differences pursuant to the terms of the existing written *1059 agreement of July 1979 and that the failure of North American to make the required conversions of the Bank's data processing equipment was a breach of the existing agreement rather than a subsequent oral one.
The parties agree that the written contract of July 1979, any purported modification of that agreement, or any subsequent oral agreement between the parties would be one that could not "be performed within one year of the making thereof" within the meaning of the Statute of Frauds. No case has been called to our attention where an oral agreement to amend a written agreement has been held to be enforceable over a Statute of Frauds defense where, as here, the amendatory agreement would be executory, and if the amended agreement is subject to the Statute of Frauds. (See 2 Corbin, Contracts sec. 301, at 88 (1950).) No contention has been made here that any such amended or new agreement comes within any exception to the Statute of Frauds.
The Bank contends that the evidence would have tended to show waiver by its opponents of any reliance by them on the Bank's repudiation of the July 1979 contract. The Bank also contends that the evidence would have shown that its opponents were estopped from so relying. Neither estoppel nor waiver was ever pleaded by the Bank. We do not know the context in which these issues might appear at retrial and do not express an opinion upon them other than to note that continued performance under a contract for construction or performance of service does not always constitute a waiver of a breach of the contract. John Kubinski & Sons, Inc. v. Dockside Development Corp. (1975), 33 Ill. App.3d 1015, 339 N.E.2d 529.
Upon the basis of the record before the trial court, it ruled properly in restricting the admission of the evidence in dispute.
 3 Another important point before the trial court consisted of Central's proof of damages. It presented proof of the contract price it would have received if the contract had been performed, and it presented evidence of expenses it would have incurred to perform the contract, but which it saved by not having to do so. The trial court let this evidence stand as being a sufficient showing to prove damages if Central was entitled to recover. The theory in support of Central's position and the trial court's ruling is that damages for a breach of a contract of this nature may be proved by subtracting the expenses saved from the contract price. The Bank contends that this formula is wrong, because some deduction should also be made for the overhead expense that Central would have incurred regardless of whether the contract was performed.
*1060 The question of the proper treatment of overhead expenses in awarding damages for the breach of a contract of this nature is one on which the authorities are not in agreement. (See Annot., 3 A.L.R. 3d 691 (1965).) The Illinois cases touching upon the question do not give a clear answer.
In Rivenbark v. Finis P. Ernest, Inc. (1976), 37 Ill. App.3d 536, 346 N.E.2d 494, suit for breach of contract was brought by a building subcontractor against the general contractor who admitted on appeal that it had breached the contract. The trial court awarded the subcontractor certain sums for damages for work completed, interest on a note and anticipated profits from the contract. The appellate court reversed the award for anticipated profits and awarded a new trial on that issue. The plaintiff's evidence of lost profits consisted of a calculation of the percentage of profit that had been realized on the work completed and application of that same percentage to the portion of the contract price attributable to the work not completed. The court stated:
"We find this figure erroneous because plaintiff's witness employed an incorrect method of calculation of lost profits. Plaintiff presented no evidence of the projected cost of completion of the work. There was no testimony regarding anticipated direct costs (labor and material), indirect costs (overhead and other expenses) or how long it would have taken to complete the contract. Without such testimony the proper amount of lost net profit cannot be ascertained. It may be that plaintiff's cost of completion would have been greater than the contract price for the work remaining. In this instance, plaintiff would not be entitled to any lost profits. On the other hand, plaintiff's estimate may well approximate a fair amount of anticipated profits lost as a result of defendant's breach. Under these circumstances we conclude that the court erred in awarding lost profits in the manner calculated." 37 Ill. App.3d 536, 541, 346 N.E.2d 494, 498.
Prior to determining that the trial court had permitted an improper method of calculation of damages, the Rivenbark court discussed principles of damages which it considered in reaching its decision. The court stated that "[t]he net profits lost by breach of contract are ascertained by deducting from the contract price those expenses necessary for full compliance on the plaintiff's part." (37 Ill. App.3d 536, 539, 346 N.E.2d 494, 497.) The court then explained that a plaintiff's direct costs of performing a contract are often avoided by a defendant's breach, and clearly such costs should be deducted *1061 from the contract price in determining damages, but that the manner of treating indirect costs had not been decided in this State. The court then quoted at length from a text which explained that some cases take the position that indirect costs (overhead) should also be deducted from the contract price, but that such conclusions were often reached without explanation. 22 Am.Jur.2d Damages sec. 178 at 255-56 (1965).
The text quoted in Rivenbark indicated that in cases where the breach of a contract by a defendant allowed the plaintiff an opportunity to enter into other contracts which would bear the same portion of the overhead costs as would the breached contract, the requirement that these costs also be deducted from the contract price was merely "an expression of the doctrine of avoidable consequences." The text then stated:
"`However, if the indirect costs are of the type which cannot be reduced following the breach, and if the plaintiff could have entered into further contracts even though the defendant had not breached the contract, then the fact that the plaintiff did enter into contracts after the defendant's breach does not lessen or eliminate the plaintiff's indirect costs. Had the defendant not breached the contract, the plaintiff would have had the defendant's full contract payment, in addition to the payments from the subsequent contracts, to pay his fixed indirect costs. Deducting indirect costs from the contract price to arrive at net profit results in giving the plaintiff one less contract from which these costs can be paid, and reduces his total net profit by the amount of the deduction. Several cases recognize this factor of undercompensation and do not deduct overhead in arriving at net profit. These are, however, statements of general principles, and individual cases must be analyzed carefully to determine whether they vary from assumptions on which these principles are based.' 22 Am.Jur.2d Damages sec. 179, at 255-56 (1965)." (Emphasis added.) Rivenbark v. Finis P. Ernest, Inc. (1976), 37 Ill. App.3d 536, 540, 346 N.E.2d 494, 497-98.
Whether the Rivenbark court followed the rationale of the quoted text is difficult to determine. If that theory were to be followed, it is difficult to see how the amount of the indirect costs referred to in the court's explanation of its decision would be necessary. However, the opinion does not indicate whether the contractual breach there might have enabled the subcontractor to engage in work it could not otherwise have performed and to allocate portions of its overhead to that *1062 work. In S.A. Maxwell Co. v. DeSoto Inc. (1979), 73 Ill. App.3d 844, 392 N.E.2d 33, and Henry's Drive-In, Inc. v. Anderson (1962), 37 Ill. App.2d 113, 185 N.E.2d 103, the courts concluded that allocated overhead costs must be deducted from the contract prices or gross receipts under contracts in computing damages for breach of contracts. In S.A. Maxwell, the opinion indicated that the breach would not have given rise to other opportunities for earnings to which portions of the overhead could be allocated. No such determination was possible from the Henry's Drive-In, Inc. opinion. In any event, neither court discussed the question of overhead expenses as extensively as the Rivenbark court.
Despite the paucity of Illinois authority on the question of the proper consideration of overhead expenses and the indication in the cited cases that deduction for overhead should have been required here, we conclude that the trial judge here applied the proper rule. (22 Am.Jur.2d Damages sec. 178, at 255-56 (1965).) The evidence indicated that Central had only one other contract and would have had overhead expenses which would not have been diminished by the Bank's breach.
Our holding is supported by that in Vitex Manufacturing Corp. v. Caribtex Corp. (3d Cir.1967), 377 F.2d 795. Vitex operated a plant in the Virgin Islands where it processed cloth. At a time when its plant was shut down, it entered into a contract to process cloth for Caribtex. In breach of the contract, the latter sent no material to Vitex for processing and Vitex sued for damages. The district court, sitting at bench, entered a judgment for Vitex. The damages were calculated by deducting the costs Vitex was saved from the contract price. Overhead expenses which would have been incurred regardless of the contract were not deducted. Caribtex contended that a deduction for overhead should have been made. In affirming, the Circuit Court of Appeals stated that "since overhead is fixed and nonperformance of the contract produced no overhead cost savings, no deduction from profits should result." (377 F.2d 795, 798.) The court noted that if overhead expenses to Vitex were not considered to be a required deduction from contract price in considering profit, it should be considered an additional loss incurred.
 4 As nearly as possible, damages for breach of contract should place the party injured in the position it would have been if no breach had occurred. If the injured party performs work and is entitled to receive money for performance under the contract, that injured party receives less revenue over which to spread its fixed costs unless it is enabled by the breach to obtain and perform similar work. If other *1063 work is not obtained, the injured party is not made whole unless some portion of the damages awarded compensates it for the portion of overhead which should be allocated to that contract. Any expense saved by the breach should not be treated as overhead.
 5 As described in Vitex Manufacturing Co., either of two methods can be used to make whole the injured party with the type of overhead expense described. One is to award damages for the contract price less the award of expenses saved because the injured party is not required to perform. This method is the simpler, because it does not require any determination as to the amount of overhead to allot to the breached contract. The other method is to determine the amount of overhead applicable to the contract. This portion of overhead should then be included in the amount to be deducted from the contract price. Then, after determining loss of net profits in this manner, an additional award of damages should be made for the overhead expense applicable to the breached contract for which no reimbursement was obtained. This method has the advantage that the terminology used is more accurate. Overhead expense is universally treated as an expense necessary to deduct in determining net profit. Moreover, in contract analysis, the overhead expense is thus treated as an investment made in reliance on the contract for which the injured party should recover, and the net profit figure obtained is the gain prevented by the breach, or the expectation factor of the damage formula. Either method is permissible and will reach a fair result.
We recognize that the evidence may be difficult at retrial, particularly with reference to overhead expenses that might be saved. However, we deem it necessary for us to pass upon the general nature of the formula for the assessment of damages. Argument has been made as to the speculative nature of the evidence concerning damages. As the totality of this evidence is likely to differ on retrial, we do not pass upon that aspect of the evidence at the previous trial.
We do not consider it necessary or desirable for us to pass upon other claims of error. We reverse the judgments entered and remand to the circuit court of Macon County for a new trial.
Reversed and remanded.
MILLER and WEBBER, JJ., concur.