RODNEY K. MOHR, Plaintiff-Appellee, v. DIX MUTUAL COUNTY FIRE INSURANCE COMPANY, Defendant-Appellant.

Fourth District No. 4—85—0490

Opinion filed May 13, 1986.

John F. Bramfeld, of Phebus, Tummelson, Bryan & Knox, of Urbana, for appellant.

William M. Goldstein, of Urbana, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiff, a farmer and defendant's insured, lost a tractor and several pieces of equipment in a fire. Subsequently, after talking to defendant's adjuster, plaintiff signed a blank proof-of-loss form. Defendant issued checks in settlement of the claim. However, plaintiff rejected the checks as inadequate and not representative of the actual cash value of the lost tractor, blade, and plow. After making multiple

attempts to discuss the dispute with defendant, plaintiff brought suit seeking compensatory, consequential, and punitive damages for fraud, vexatious delay in settling his claim, and breach of contract.

The jury found defendant had not engaged in fraudulent conduct. However, it awarded $120,000 in damages for the lost equipment and $105,000 in damages for lost profits on the contract claim. The court found defendant's conduct constituted vexatious delay in settling the claim. (Ill. Rev. Stat. 1983, ch. 73, par. 767.) Therefore, it awarded costs, $42,666 in attorney fees, and $5,000 punitive damages. We affirm the compensatory-damages award, vacate in part and reduce the award for lost profits, affirm the finding that defendant's conduct constituted a violation of section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1983, ch. 73, par. 767), but vacate in part and reduce the attorney fees award, which was based upon a contingent-fee arrangement.

In 1978, plaintiff purchased a Steiger-Panther tractor, blade, plow, and other equipment on a lease-purchase arrangement. Plaintiff needed the larger equipment to economically farm the ground he leased and owned. Plaintiff paid $30,000 in 1981 for the use of the equipment in 1982. Plaintiff and Dave White testified that the tractor, a 1979 model, was in excellent shape and was equipped with every available option. White, a farmer and implement dealer, said the equipment was the most suitable to economically farm 1,700 acres. Plaintiff agreed to insure the equipment. In 1980, he renewed his insurance with defendant. The policy covered the actual cash value of the equipment at the time of the loss.

Plaintiff leased approximately 687 acres of ground from the Clark family. The lease was on a cash-rent basis. On November 1, 1981, he made the final payment for 1981 and tendered 10% of the lease amount for 1982. He had fall plowed and disced the ground. Plaintiff stated that he annually alternated crops, planting both corn and soybeans. He did not make the next lease payment, due March 1, 1982, and by April 1982 had only made part of a loan payment. He also missed a late February 1982 loan payment. Plaintiff stated the bankers understood that his missed payments were due to difficulty in hauling grain. He agreed that his net worth had been decreasing. On April 6, 1982, after realizing the loss would not be settled, he forfeited his lease on the Clark ground.

On February 12 and February 13, 1982, while plaintiff and his wife were away from home, fire destroyed his barn and the equipment within it. When plaintiff arrived home, his wife had already contacted their agent, Bob Thompson, who contacted defendant. Walter

Pribble, defendant's adjuster, viewed the damage a few days later. Plaintiff testified that he and Pribble did not discuss the loss during the first meeting, but Pribble told plaintiff to make a list of destroyed items and their values. Plaintiff's worksheets, reflecting his estimated valuations, were introduced into evidence. Pribble returned a week later with defendant's representatives, who inspected the fire damage.

On March 25, defendant's claims committee and Donald Gard, defendant's director, met with Pribble. They reached a consensus decision as to the valuations Pribble should place on the destroyed equipment. They also reviewed various valuations of the tractor. Pribble did not have any written valuation which reflected the $50,000 valuation set for the tractor. Gard testified that he believed that Pribble had discussed the proposed values with plaintiff prior to the meeting. Kenneth Moore and Ronald Kuhns, farmers and members of defendant's board, had previously inspected the fire loss. They were a part of the claims committee. Both testified that they agreed that Pribble could offer $87,000 plus or minus 10% in settlement of the claim. Pribble's worksheets, containing equipment valuations, were entered into evidence.

On March 26, Pribble met with plaintiff and his wife at their farm. The substance of the meeting is disputed. Plaintiff and Pribble agreed that Pribble brought a worksheet, containing a list of items and estimated values, with him. Plaintiff stated that he emphatically disagreed on the proposed valuation of the tractor, blade, and plow. They also disagreed on the valuations of many of the items. He and Pribble, however, agreed on values for some of the destroyed equipment and tools. Pribble stated that they would come back to the items which were in dispute.

Plaintiff further stated that Pribble had not assigned any value to used lumber stored in the barn. Pribble told him the lumber would be his way out and perhaps he could increase the offer after talking to defendant. Pribble then asked plaintiff to sign the blank proof-of-loss form to facilitate a settlement and save him a trip to plaintiff's farm. Plaintiff's wife corroborated his account.

Pribble testified that after he initially met with plaintiff, he called several equipment dealers, called the tractor manufacturer's home office, and obtained a copy of the equipment lease. He received estimated valuations on the tractor ranging from $60,000 to $80,000. He received a $6,000 estimated valuation on the blade, and he received a $13,000 estimated valuation on the plow. However, dealer estimates are usually high. On March 26, he and plaintiff agreed on valuations

for all of the lost items, except the tractor and a few miscellaneous items. He, plaintiff, and plaintiff's wife agreed that the total amount of the settlement would be $97,600 without attempting to agree on a valuation for each individual item.

Pribble further testified that he intended to value the tractor at $80,000 on the proof of loss, but plaintiff requested a lesser valuation. Plaintiff did not explain why he wanted the lesser valuation shown on the proof of loss, and Pribble did not ask. Pribble stated that he had a blank proof of loss with him and gave plaintiff a copy of his handwritten worksheet, showing the totals. He asked plaintiff to sign the blank document, explaining that his secretary would type information on the document. This was because he had poor penmanship. Pribble agreed that he told plaintiff that his signature would speed the process and avoid delay. He thought it was coincidental that the tractor valuation agreed upon by the claims committee on March 25 and the valuation which he and plaintiff agreed upon on March 26 were identical.

Defendant issued two checks to plaintiff in settlement of his claim. One check, for plaintiff's wholly owned property, was for $34,639.72. The second, for the leased equipment, issued in the name of plaintiff and the lienholder, was in the amount of $63,000. Eventually, defendant reissued the checks on September 1, 1982. They were never cashed.

Plaintiff testified that Thompson brought the checks to his farm in early May 1982. However, he did not accept them, because they represented Pribble's initial amounts, rather than any negotiated amounts. Plaintiff asked Thompson to arrange a meeting between him and defendant's representatives. In July, Thompson sent a letter and asked in writing for a meeting. In September, plaintiff contacted an attorney, who sent a letter to defendant explaining that a blank proof-of-loss form had been signed. The letter also expressed dissatisfaction with the settlement amount and requested a new proof-of-loss form. Defendant did not send a blank proof-of-loss form.

Thompson, an agent for Spicer Insurance Agency, handled plaintiff's policy. From February 27, 1982, forward he called Gard every few days, asking why they were no closer to settlement. Initially, Gard told Thompson the adjuster was working on it. Later, he told Thompson the claims committee was working on it. Soon after March 26, plaintiff contacted Thompson and was very concerned about the proof of loss. Thompson stated that plaintiff understood the proof of loss was a formality necessary to start the settlement process. Thompson was concerned because he had never heard of a proof of

loss being used to initiate the settlement process. However, he did nothing at that time. He talked to Gard frequently between February and May 1982. In early May, Thompson tried to deliver the checks, but plaintiff would not accept them. Therefore, Thompson telephoned Gard, notifying him of the rejection. Gard stated that the checks were the settlement offer and plaintiff did not have to accept them.

In July, at plaintiff's request, Thompson wrote a letter to defendant, attached an estimate of the tractor's value, and requested a meeting at which the dispute could be resolved. Defendant did not respond to the letter. Gard referred Thompson to defendant's attorney, but the attorney was not familiar with the matter. Between May 4 and July 9, Thompson called two board members. One told him the settlement of the fire loss was none of his business so he should not be involved. The other told Thompson that he thought the settlement was fair.

Gerald Hettinger, owner of the Spicer Insurance Agency, testified that after he became aware of a problem with plaintiff's claim, he talked to Gard at least 15 times. They specifically discussed the tractor and the building. He also talked to several board members at a meeting of defendant's agents, asking that they review the claim at plaintiff's request. The board members told him that defendant's offer was firm and they felt plaintiff was in a financial position such that he had to accept their offer. Moore and Jerry Nord were present during the conversation. They stated the conversation had not taken place.

The attorney who drafted the letter that plaintiff sent to defendant testified that he interpreted defendant's reply letter as indicating that defendant was standing by the original proof of loss and foreclosing negotiation. He admitted that defendant's reply letter could be interpreted differently.

Gard testified that defendant is a small, mutual insurance company, organized by farmers to insure their farming operations. He and Thompson discussed the dispute on an almost daily basis between April and July of 1982. He told Thompson that plaintiff could take the salvage value of the destroyed equipment in settlement of any dispute about the building. After he received the July letter and valuation of the tractor, he told Thompson that defendant could not reopen the claim for one item, because of the nature of the settlement process. Gard admitted that he could have said defendant was standing by its proof of loss and that he did not reply to the July letter. Subsequently, he turned the claim over to defendant's attorney and thought that plaintiff should deal with the attorney. He admitted the attorney's initial responsibility was to check the record for liens.

Gard further admitted that he did nothing after learning plaintiff had rejected the checks. After receiving a letter from plaintiff's attorney, he talked to defendant's attorney, who responded to the letter. Gard did not contact Pribble and assumed plaintiff was not truthful. Gard agreed that defendant owed plaintiff $97,639.72, the original settlement offer.

Phillip Duffy, vice-president and commercial-lending officer at Bank of Illinois, prepared cash-flow sheets for plaintiff's farming operation and estimated income and profit. In the winter of 1981-82, he and plaintiff determined plaintiff was better off financially farming the Clark ground. Plaintiff was current on all of his Bank of Illinois indebtedness in April of 1982. Subsequently, they reached an agreement where the payment would be applied directly to the principal of the loan. Duffy estimated, based upon his knowledge of plaintiff's finances, the commodities market, and expenses, that plaintiff would have had a $50 to $60 per acre profit on corn production in 1982 if he had farmed the Clark ground. If he had not farmed the Clark ground, he would have had a $45 to $50 per acre profit on corn. The profit on soybeans would be $40 to $45 per acre. Duffy testified that he considered the $30,000 payment for the leased equipment when calculating profits. The leased payments were made in advance. Plaintiff had paid for the 1982 year; since he did not farm the added ground in 1983, he did not make an advance payment for the next year on the leased equipment. Costs were essentially the same in 1983. In 1984, expenses and income were down.

Duffy admitted that in late March 1982, he concluded plaintiff was in financial difficulty. Some of the difficulty preceded the fire loss and was caused by poor crop years. Plaintiff owed the bank $500,000 and was late on a payment because of difficulty in hauling grain when the fire occurred.

Dave White testified that he sells and services new and used Steiger tractors. In the seven years preceding the trial, he had been the largest Steiger tractor dealer in the world and was personally familiar with plaintiff's tractor. He considered the condition of the tractor, its options, and its age. He also concluded that the burned tractor did not have any salvage value. The actual cash value of the tractor prior to the fire was $68,000. This was a very conservative estimate. White noted that prices were steady at the time of the fire but the bottom dropped out of the agricultural industry in the late spring of 1982. Greg Cox testified that he has sold six Steiger tractors and is familiar with the market. The dealer's cost on a 1978 tractor was $59,000. A 10% markup is normal. Therefore, the tractor new would

have cost $67,000 to $68,000. Its value before the fire was $45,000 to $55,000.

Initially, defendant argues that the issue of consequential damages should not have gone to the jury because section 155 of the Illinois Insurance Code preempts damage claims based upon vexatious conduct on the insurer's part (Ill. Rev. Stat. 1983, ch. 73, par. 767) and does not allow a damages award for lost profits.

Section 155 of the Illinois Insurance Code states:

> "Attorney fees. In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable cost in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts ***." Ill. Rev. Stat. 1983, ch. 73, par. 767.

In count IV of plaintiff's complaint, he alleged essentially that defendant's actions in failing to tender the actual cash value of the tractor, plow, and blade breached the insurance contract and that the delay was also vexatious and unreasonable, violating the statutory proscription. The jury returned a verdict on count IV, awarding damages for the lost equipment and for lost profits. The trial court then made a separate finding that the conduct was vexatious and unreasonable.

■■ ■ Where an insured alleges that the insurer has refused to comply with the provisions of an insurance policy, the measure of damages is usually limited to the contractual amount. Consequential damages, however, may be recovered where they were reasonably foreseeable, were within the contemplation of the parties at the time the contract was entered, or arose out of special circumstances known to the parties. (*Clark v. Standard Life & Accident Insurance Co.* (1979), 68 Ill. App. 3d 977, 386 N.E.2d 890.) By its terms, section 155 of the Illinois Insurance Code allows the trial court to make a finding that the insurer's conduct constituted vexatious or unreasonable delay in any cause where there is an issue of the insurer's liability on a policy or where the issue revolves around the amount of the loss payable under the policy. The statute does not limit recovery for the breach of contract but limits and refines recovery for the tort of vexatious and unreasonable delay. (See generally *Kinney v. St. Paul Mercury Insurance co.* (1983), 120 Ill. App. 3d 294, 458 N.E.2d 79; *McCall v. Health Care Service Corp.* (1983), 117 Ill. App. 3d 107, 452 N.E.2d 893; *Hoff-*

*man v. Allstate Insurance Co.* (1980), 85 Ill. App. 3d 631, 407 N.E.2d 156; *Tobolt v. Allstate Insurance Co.* (1979), 75 Ill. App. 3d 57, 393 N.E.2d 1171.) The jury properly considered the issue of lost profits.

■ Next, defendant argues and we agree, in part, that lost profits were not proved with reasonable certainty. Insurance policies are contracts, and the principles which apply to contracts generally apply to them. (*State Farm Mutual Automobile Insurance Co. v. Salerno* (1984), 121 Ill. App. 3d 384, 459 N.E.2d 1075; *Rivota v. Kaplan* (1977), 49 Ill. App. 3d 910, 364 N.E.2d 337.) In Illinois, when a breach of contract without more is alleged, the injured party should be put in as good a position as he would have been in had the contract been fully performed. *Central Information Financial Services, Ltd. v. First National Bank of Decatur* (1984), 128 Ill. App. 3d 1052, 471 N.E.2d 992; *Clark v. Standard Life & Accident Insurance Co.* (1979), 68 Ill. App. 3d 977, 386 N.E.2d 890.

■ Lost profits may be recovered where the loss is shown with reasonable certainty, the defendant's wrongful action caused the loss, and the lost profits were within the contemplation of the parties when they entered the contract. When profits which are sought arise out of the breached contract, profits are considered an element of the contract and are presumed to have been within the contemplation of the parties. However, as in the instant case, where the profits sought arise out of a collateral transaction, the plaintiff must establish the damages with reasonable certainty and also show lost profits were within the contemplation of the parties at the time they entered the agreement. (*Rivenbark v. Finis P. Ernest, Inc.* (1976), 37 Ill. App. 3d 536, 346 N.E.2d 494.) The ascertainment and assessment of damages is a question of fact for the jury. (*Werner's Furniture, Inc. v. Commercial Union Insurance Co.* (1976), 39 Ill. App. 3d 59, 349 N.E.2d 616.) The amount of damages may not be speculative; however, it need not be proved to a mathematical certainty. *Hemken v. First National Bank of Litchfield* (1979), 76 Ill. App. 3d 23, 394 N.E.2d 868.

Here, a fact question existed as to whether the possibility of lost profits was within the parties' contemplation at the time the policy issued. Gard testified that defendant was established by farmers to insure their business operations. That lost profits would result from an inadequate or uncompensated equipment or inventory loss could reasonably be inferred to have been within the parties' contemplation when contracting. Defendant also argues that plaintiff did not establish that its acts proximately caused the loss of the Clark ground. The evidence shows that plaintiff was in a shaky financial condition at the time of the fire. However, both he and Duffy testified that he had de-

cided to farm the Clark ground in 1982. He had fall plowed and made a 10% advance payment on the lease. Plaintiff testified that he forfeited the lease because he realized the loss would not be easily resolved and his equipment would be inadequate to farm the additional ground. Under the circumstances presented here, we cannot say plaintiff failed to establish that defendant's wrongful act caused the loss of the Clark ground.

■ However, the lost profits award for 1983 and 1984 was based upon speculation and, therefore, must be reversed. Duffy testified that plaintiff in 1982 would have had a $50 to $60 per acre profit on the Clark ground on corn production. He noted that the profit on bean production would be $40 to $45 per acre. He then stated that costs stayed the same in 1983 and 1984. Plaintiff testified that he rotated the crops on the Clark ground. The jury apparently rounded up the 687 acres leased to 700 acres. It then took the low corn figure, $50, multiplied by the 700 acres and three years. This would result in the $105,000 figure which the jury awarded for lost profit. Plaintiff and Duffy testified that on November 10, 1981, plaintiff made the equipment-lease payment for the 1982 season. Damages for a breach of contract should place the injured party in the same position he would have been in had the breach not occurred. (*Central Information Financial Services, Ltd. v. First National Bank of Decatur* (1984), 128 Ill. App. 3d 1052, 471 N.E.2d 992. Lost profits need not be shown with mathematical certainty; however, they may not be speculative. (*Hemken v. First National Bank of Litchfield* (1979), 76 Ill. App. 3d 23, 394 N.E.2d 868.) Where a plaintiff's damages flow from a loss of business, the amount of compensation should be the same whether the loss was caused by a breach of contract, negligence, or nuisance. *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323.

The damage award for 1983 and 1984 assumes that plaintiff would have renewed his lease in 1983 and 1984. It speculates that the commodities market would have remained stable, thus ensuring a like amount of income. A damages award may not be speculative. (*Hemken v. First National Bank of Litchfield* (1979), 76 Ill. App. 3d 23, 394 N.E.2d 868.) Therefore, the lost profit award for 1983 and 1984 must be reversed.

■ Defendant next argues that the trial court abused its discretion in finding that his conduct constituted vexatious and unreasonable delay in settling the claim. A trial court must consider the totality of the circumstances before it determines that an insurer's conduct violates section 155 of the Illinois Insurance Code. The court should

consider the attitude of the insurer. (*Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 124, 371 N.E.2d 1147, 1149.) Damages under the statute are not applicable simply because the insurer was unsuccessful or refused to settle. (*Fisher v. Fidelity & Deposit Co.* (1984), 125 Ill. App. 3d 632, 466 N.E.2d 332; *Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 371 N.E.2d 1147.) The court may consider that the insured was forced to file suit to recover (*Fassola v. Montgomery Ward Insurance Co.* (1982), 104 Ill. App. 3d 825, 433 N.E.2d 378) and that the insured was deprived of the use of his property. (*Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 371 N.E.2d 1147.) However, if there is a *bona fide* dispute about coverage, delay in settling a claim may not violate the statute. *Marvel Engineering Co. v. Commercial Union Insurance Co.* (1983), 118 Ill. App. 3d 844, 455 N.E.2d 545.

The testimony showed that defendant ignored repeated attempts by plaintiff to set up a meeting to discuss the dispute. If the trial court believed Hettinger and Thompson, the record indicates that the insurer's attitude was that plaintiff, due to his financial circumstance and the fact that he needed to engage in spring planting, would be forced to accept the offer. It is uncontested that defendant ignored repeated attempts by plaintiff, first through Thompson, then through attorneys, to discuss the dispute. The trial court did not abuse its discretion in finding a vexatious and unreasonable delay in settling the claim. *Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 371 N.E.2d 1147.

Defendant next argues that the compensatory damages award is not supported by the evidence, maintaining that the only alternative valuation for the burned property presented at trial was White's $68,000 valuation of the tractor. Therefore, it argues the maximum award the jury could make was $97,639.72, the settlement offer, plus $18,000. The jury awarded $120,000 compensatory damages. Pribble, at trial, admitted that he thought the tractor was worth $80,000, but plaintiff talked him into a lesser valuation. Later, Pribble stated that he thought the tractor, plow, and blade were worth $80,000. The jury also had Pribble's worksheets, which showed valuations for the leased equipment. All of the valuations for the tractor were over $50,000. The jury heard extensive testimony from plaintiff, Pribble, and White about their estimates as to the value of the equipment. No error occurs when a jury accepts a high estimate of damages when both high and low estimates are before it. (*Bert Jackson Motors, Inc. v. Chambers* (1969), 114 Ill. App. 2d 209, 252 N.E.2d 239.) The compensatory damages award was supported by the evidence.

██ We agree that attorney fees, under the instant circumstances, should be reduced. The attorney fees were awarded based upon a contingent fee arrangement whereby plaintiff agreed to pay his attorney one-third of the amount by which the jury verdict exceeded the initial settlement offer. The parties stipulated to the reasonableness of the arrangement. The trial court used $97,000 as the settlement offer. Since we have determined that damages for 1983 and 1984 were not established with sufficient certainty, the attorney fees award must be reduced. Since the amount of the jury's verdict has been reduced to $155,000, $58,000 over the settlement offer, attorney fees should be reduced to $19,133.

For the above reasons, we affirm the compensatory damage award and the trial court's finding of vexatious delay, vacate in part and reduce the award for lost profits, and vacate in part and reduce the attorney fees award and remand for entry of a judgment pursuant to the disposition.

Affirmed in part and vacated in part; cause remanded, with directions.

WEBBER and MORTHLAND, JJ., concur.