EDWARD FISHER *et al.*, Plaintiffs-Appellees, *v.* FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant-Appellant (Mid-Central Asphalt Company, Defendant).

Fifth District   No. 5—83—0510

Opinion filed June 27, 1984.

Edward P. McNeela and Neal R. Novak, both of McNeela and Griffin, Ltd., of Chicago, for appellant.

David O. Hesi, of Wiseman, Shaikewitz, McGivern & Wahl, P.C., of Alton, for appellees.

JUSTICE KARNS delivered the opinion of the court:

Fidelity and Deposit Company of Maryland (Fidelity), a surety, appeals from the judgment of the circuit court of Madison County which, following a bench trial, found Fidelity liable to Edward and Christina Fisher, d/b/a C&E Productions (Fisher), for damages arising from the breach by Fidelity's principal, Mid-Central Asphalt Company (Mid-Central), of a construction contract to build a recording studio for Fisher.

On December 2, 1973, Fisher and Mid-Central entered into a contract for the construction of a recording studio and office, 30 feet by 50 feet. Fisher provided sketches which indicated that the building was to be 35 feet by 50 feet and that a large interior window was to be built between the studio and control room. On two diagrams the window was shown as 10 feet wide, but on a third it was originally marked as "Approx 8' x 4' " and then changed to "10' x 4'." The change was not initialed or dated. The contract price was $14,589.55.

All funding for the construction came from a Small Business Administration (SBA) loan of $50,000 to Fisher and C&E Productions. Only $14,600 of the loan was authorized for construction. The SBA required Mid-Central to secure bonding. In completing the application for a bond from Fidelity, Mid-Central wrote in "Performance" above the word "Contract" and indicated that the amount of the bond was $14,595.55, the full contract price for a 50 feet by 35 feet block building. Mid-Central was to begin immediately and complete the work in 90 days, receiving a 20% advance payment of $2,918 and other payments on a "progressive" basis. The application form supplied by Fidelity stated that Fidelity was "authorized but not required" to take possession of the work, contract for its completion, or settle any claim upon the bond in the event its principal abandoned or breached its contract. On January 18, 1974, Fidelity executed its bond in the amount of $14,595.55, with Mid-Central as principal and the SBA as the owner.

The face of the bond stated:

"WHEREAS, the Principal has entered into a certain written agreement, dated the 18th day of January 1974, with the Owner for Construction of 50' X 35' Block Building, consisting of an office, recording studio, rehearsal room, bath and toilet, Located at 6330 Church Road, Centreville, Illinois which agreement is or may be attached hereto for reference.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, That, if the Principal shall well and truly perform and carry out the covenants, terms and conditions of said

agreement, then this obligation to be void; otherwise to remain in full force and effect."

The agreement between Fisher and Mid-Central provided that changes could be effected only upon "prior written approval and acceptance of Mr. Eddie Fisher." No such written approval of any change was ever made. Mid-Central agreed to pay all bills prior to delinquency, to bear the cost of work which exceeded the contract price for any reason, to claim no payment for extras unless specified in a written order executed by both Fisher and Mid-Central. In the event of default by Mid-Central, Fisher had the option upon 48 hours' written notice of taking over part or all of the work in "whatever method it deems expedient." The contract then stated that Mid-Central "shall than [sic] not be entitled to receive any further payment until the work is finished, and if the unpaid balance of the contract price exceeds *** [Fisher's] expenses of completion of the work such excess shall be paid to the sub-contractor. If expenses exceeds [sic] the unpaid balance, sub-contractor shall pay the difference to the contractor within 60 days after request by contractor."

The SBA set up an escrow account at Edgemont Bank where funds were held until SBA authorized their transfer to Fisher's business account. Checks from that account were made jointly to C&E Productions and Mid-Central but were to be issued only in exchange for receipts and lien waivers. On January 4, 1974, a check for $2,920 was authorized. This was the first payment to Mid-Central. Mid-Central began work on concrete footings but stopped in February 1974 because it had no money. On February 28, 1974, SBA authorized a check for $1,178.77 payable to C&E and Mid-Central. No other checks were issued jointly to C&E and Mid-Central because SBA authorized Fisher to make direct payments to suppliers. In March 1974, Fisher paid F. G. McGraw for work done on Mid-Central's order in February but not paid for. Work continued until April 1974 with both Fisher and Quinn, Mid-Central's president, on the site, but McGraw said he was on the site 80% of the time in February and March and saw Quinn only once. Fisher testified that he did not order materials or supervise the work but only paid for the work as Quinn directed.

When work stopped altogether in April 1974, Fisher had spent more than $13,000 on the job, with $4,098 going to Mid-Central. After work stopped, Fisher went to Quinn's office but it was closed. Fisher next contacted the SBA, which advised him to contact Fidelity. Fidelity refused to undertake completion of the building as Fisher asked, pointing out that Fisher was not shown as owner on the bond contract. On April 17, 1974, the SBA demanded payment of the face

value of the bond. Fidelity advised the SBA it was making a prompt inquiry of its principal. On April 29, 1974, Fidelity wrote to Quinn and other indemnitors that it had "been advised of a claim of default under the contract and the bond." Another letter of the same date to Quinn as president of Mid-Central requested a statement of Quinn's position with "regard to the allegations of default ***" so that Fidelity could respond to the SBA. Business records from Fidelity's files show that the inquiry continued through December 1974.

Although Fisher's attorney recognized in 1974 that "unless something is done quickly, the damages may become very large," the case moved slowly. On June 18, 1974, Fisher filed suit in Federal Court against Mid-Central, Fidelity, and the SBA alleging default by Mid-Central and Fidelity. He asked that Mid-Central and Fidelity be ordered to complete the work and supply funds or that the SBA be required to fund the work. In December 1975, the Federal Court reformed the bond to substitute Fisher for the SBA as owner. In April 1976, upon Fisher's motion, the Federal Court dismissed the cause without prejudice. The complaint filed in State court on February 1, 1976, prayed that Fidelity be required to complete the work or pay for the completion up to the amount of the bond. In count II Fisher alleged Fidelity's bad faith in issuing the bond, Fidelity's delay and denial of amounts due under the bond as the proximate cause of "physical, mental, emotional distress and discomfort ***," and Fidelity's intent to cause emotional distress as justifying punitive damages. Fidelity answered Fisher and cross-claimed against Mid-Central in April 1976. A year later Fisher was granted leave to file a reply to Fidelity's answer. Fisher denied that the work was substantially completed or that he had blocked Mid-Central's completion of the work. This was Fisher's last filing until 1981, when he sought reinstatement after the cause had been dismissed for want of prosecution. In the interim Fidelity filed a third-party complaint against Quinn and other individual indemnitors. In 1979 Fidelity moved for a default against the indemnitors because they had failed to appear.

In 1981 Fisher's cause was reinstated and set for trial on October 7. On October 22 the complaint was amended to include count III alleging that Fidelity's failure to act had caused the loss of contracts and "large sums of money" as well as preventing Fisher from repaying the SBA interest. On Fidelity's motion, all of count III and paragraph 33 of count II seeking damages for emotional distress were dismissed because loss of profits from a new business was not recoverable and damages for emotional stress were contrary to law. On January 31, 1983, Fisher amended the complaint to add count IV,

which realleged count III and added two paragraphs seeking fees, costs, and damages allowed under the Illinois Insurance Code (Ill. Rev. Stat. 1983, ch. 73, par. 767) for vexatious and unreasonable delay. Fisher also specifically sought damages for interest due on the SBA loan, taxes paid on the property, and lost profits. Fidelity moved for summary judgment on the issue of vexatious delay, alleging that Fidelity had made a settlement offer of $15,000 on February 24, 1982. The motion was taken under advisement.

Over continuing objections of Fidelity's attorney, the court heard evidence that Fisher owed the SBA $50,000 principal and more than $31,000 in interest but that his loan was at that time considered uncollectible; that it would cost $44,175 to complete the building in 1983 if certain necessary additions to the original plan were made; and that Fisher had lost $16,700 in net rental income between 1974 and 1983. No evidence was produced to show that taxes on the property had been paid. No evidence of emotional distress was offered.

Fidelity contended that Fisher had made changes in the building design which materially altered its risk, so that it should be discharged from its bond obligation. It appeared that an exterior window had been omitted and that a proposed interior window had been enlarged. A contract between F. G. McGraw and Fisher stated the height of the building to be 13'4" instead of the original 12'. McGraw received no additional pay for the larger building.

The court denied Fidelity's motion for judgment at the close of all the evidence. On June 28, 1983, after reviewing all the testimony and post-trial memoranda by both parties, the court found that Fidelity bound itself to carry out all the terms and conditions of Mid-Central's contract, that Mid-Central had abandoned the project, that Fisher had paid the costs under Mid-Central's direction and had substantially performed at the time of Mid-Central's breach. The court determined it was unnecessary to address Fidelity's contentions that Fisher had breached the contract in failing to notify Fidelity in writing of Fisher's intention to take over the work and in deviating from the contract specification without written orders, but it found nevertheless that the change in the method of payment did not enlarge the surety's risk and there was no deviation from the contract which increased the cost. The court found that Fidelity's tender of $15,000 in 1982 was a waiver of defenses and an admission of liability and that Fidelity's eight-year delay in admitting liability showed its conduct to be "vexatious, unreasonable, malicious and oppressive." Judgment was entered in favor of Fisher for $14,595.55 plus prejudgment interest from July 1, 1974, $21,813.95 in lost net rental income, $7,122.29

in fees and costs pursuant to section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1983, ch. 73, par. 767), $5,000 for vexatious conduct under the same provision, and $25,000 in punitive damages for Fidelity's malicious handling of the claim. This appeal followed.

Fidelity presents the following issues for review: (1) whether counts II and IV of the complaint state causes of action; (2) whether the court erred in finding that Fidelity had tendered the bond penalty and in refusing to consider Fidelity's defenses; (3) whether Fisher breached the contract; (4) whether it was reversible error to award lost net rental income, punitive damages, recovery under section 155 and prejudgment interest from July 1, 1974. Fidelity seeks reversal or a new trial. We affirm in part and reverse in part.

■ We agree with the trial court's determination that Mid-Central had abandoned the work and that Fisher had substantially performed the contract in paying for men and materials at Quinn's direction. Lien waivers and cancelled checks show that Mid-Central continued to order materials and a Mid-Central employee continued on the job into late March. Everyone agreed work stopped finally in April, after which Quinn could not be found at his office. It is clear that Fisher's personal visit to Fidelity and SBA's demand as well as other communications between the parties gave Fidelity proper notice of a claim of default by Mid-Central very shortly after work stopped. The change in the method of paying for the work, the omission of one exterior window, a slight increase in the height of the building, and a written adjustment in the size of an interior window which was never installed do not constitute a material alteration in the contract sufficient to discharge the surety's liability. (*Claude Southern Corp. v. Henry's Drive-In, Inc.* (1964), 51 Ill. App. 2d 289, 201 N.E.2d 127.) Because we find the record supports the trial court's determination that Mid-Central was in breach of its contract and that Fidelity was not discharged of its obligation under the bond, we find it unnecessary to decide whether Fidelity's offer of $15,000 in 1982 had the effect of an admission of liability. Our view of this case makes it unnecessary to decide whether it was error to admit Fidelity's business records for the limited purpose of showing good faith investigation of Fisher's claim. Although Fidelity objects to the admission of conversations between Fisher and McCoy, an agent of Fidelity who died prior to trial, we fail to see what prejudice Fidelity is claiming. The remaining issues concern the nature and extent of Fidelity's liability to Fisher.

Fidelity claims that the court erroneously determined that the bond was a performance bond which obligated Fidelity to complete the building, rebid it or pay the face amount of the bond. It is clear

from Mid-Central's application to Fidelity that it was seeking a performance bond and that Fidelity issued its bond on the basis of the application. In Fidelity's motion to dismiss count III of the complaint, Fidelity identifies the bond as a performance bond, and at trial the claims attorney for Fidelity testified that Fidelity had written a performance bond. No objection was raised by the defense when the term "performance bond" was repeatedly used to describe the contract between Mid-Central and Fidelity.

■■ Fidelity contends that it had no obligation to take over the job but only to pay the face value of the bond once it had received notice of default and Fisher had incurred expenses in excess of the contract price. Indeed, Fidelity argues that Fisher was obliged to go forward with the work. However, the contract with Mid-Central stated that taking over the work was only an option which Fisher might choose if he thought it expedient. Fisher did not breach the contract by failing to proceed with the work himself. The face of the bond shows $14,595.55 as the limit of Fidelity's liability, but it also refers to the agreement between Fisher and Mid-Central and conditions Fidelity's obligation on its principal's failure to carry out the terms of the agreement, thus incorporating the agreement by reference. When the bond incorporates by reference the construction contract, the provisions of the contract are provisions of the bond. (*Lake View Trust & Savings Bank v. Filmore Construction Co.* (1979), 74 Ill. App. 3d 755, 393 N.E.2d 714.) Neither the contract nor bond states that Fidelity is required to complete the work.

■■ In *Lake View* the court distinguished between the surety's obligation under a performance bond to guarantee completion by the bonded contractor and its obligation under an indemnity bond where the owner must actually incur expenses before bringing suit on the bond. Where a bond guarantees performance, "the obligation of the contractor in legal effect becomes the obligation of the surety and the obligee need not actually incur expenses or correct deficient performance of the contract in order to be entitled to recover against the surety." (*Lake View Trust & Savings Bank v. Filmore Construction Co.* (1979), 74 Ill. App. 3d 755, 758, 393 N.E.2d 714, 717.) In *Lake View* the owner gave written notice of the contractor's failure to perform and demanded corrections. The surety failed to comply. The court determined that the right to recover damages from the surety as well as the contractor arose at the time of the contractor's breach.

Although Fidelity was immediately notified of Mid-Central's departure from the jobsite, the question of the contractor's breach was not quickly settled. In 1976 Fidelity denied liability because Fisher

had taken control of the project and abandoned it. Letters and memoranda from Fidelity's own records show that the investigation leading to this conclusion stopped in December 1974. Even after Fisher was substituted for the SBA, Fidelity made no effort to settle the matter, although it knew the building was incomplete. Not until October 1981 did Fidelity file a notice for a deposition of Fisher. In response to Fidelity's motion to produce, Fisher supplied documentation of his payments to Mid-Central, a $43,000 bid for completion of the building, and evidence that Fisher's business was damaged by the unavailability of the recording studio. In February 1982 Fidelity wrote a letter to Fisher, offering to settle the matter for $15,000. Fisher refused the offer as too little, too late. The evidence adduced at the 1983 trial fairly established that Mid-Central had abandoned the work and was in breach.

■ Fisher sought damages for Fidelity's delay in settling the claim. Count II of Fisher's complaint sought $5,000 in compensatory damages and $10,000 in punitive damages plus costs for emotional distress resulting from Fidelity's bad faith delay and denial. It is clear that Illinois law does not permit the award of punitive damages for the intentional infliction of emotional distress. (*Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157.) Therefore, count II fails to state a cause of action against Fidelity to the extent it seeks such punitive damages. Paragraph 33 of count II, which contains the demand for compensatory damages for physical, mental and emotional distress and attorney fees, was dismissed by Judge Day on February 1, 1982. He reaffirmed the dismissal on June 14, 1982. No damages could be awarded on the dismissed paragraph. In any event, no evidence of physical or emotional distress was offered at trial.

■ Count IV realleges count III, which had also been dismissed by Judge Day, and enlarges it to include a claim for damages provided by the Illinois Insurance Code (Ill. Rev. Stat. 1983, ch. 73, par. 767) for vexatious and unreasonable delay in handling claims. Contracts of compensated suretyship are treated as contracts of insurance. (*Town of City of Peoria v. Rauschkolb* (1948), 333 Ill. App. 411, 78 N.E.2d 123.) Insurers have a duty of good faith and fair dealing in handling claims, but they are entitled to insist on their "legal rights in a permissible way ***." (*Eckenrode v. Life of America Insurance Co.* (7th Cir. 1972), 470 F.2d 1, 5.) A cause of action for vexatious and unreasonable delay must allege facts showing conduct by the surety which is "willful, wanton, malicious, reckless, intentional or in bad faith ***." (*Tobolt v. Allstate Insurance Co.* (1979), 75 Ill. App. 3d 57, 71, 393 N.E.2d 1171, 1181.) The court must consider the totality of the

circumstances in determining vexatious delay. (*Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 371 N.E.2d 1147.) In adopting section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1983, ch. 73, par. 155), the legislature preempted the field for recovery for punitive damages for refusal to pay, barring the common law action for such remedies. (*Tobolt v. Allstate Insurance Co.* (1979), 75 Ill. App. 3d 57, 393 N.E.2d 1171; see also *Robertson v. Travelers Insurance Co.* (1983), 95 Ill. 2d 441, 448 N.E.2d 866.) The trial court found that Fidelity's delay in handling Fisher's claim was vexatious and unreasonable. Such a finding will not be disturbed on appeal unless it shows abuse of judicial discretion. (*Deverman v. Country Mutual Insurance Co.* (1977), 56 Ill. App. 3d 122, 371 N.E.2d 1147.) Considering the total circumstances of this case, we find no abuse of discretion. Fidelity's lackadaisical attitude toward determining its principal's conduct and its own liability even after two years of legal action by Fisher and repeated requests for action does not demonstrate the good faith expected of a surety.

■ Fidelity contends that the award of fair market lost net rental income is improper as a measure of damages in the present case. We agree. Fisher relies on *Board of Library Trustees v. Fidelity & Deposit Co.* (1981), 101 Ill. App. 3d 1141, 429 N.E.2d 203. In *Fountaindale* the court allowed damages for lost rental during a period of delay. (*Lindberg v. Brandt* (1953), 350 Ill. App. 317, 112 N.E.2d 746; D. Dobbs, Remedies sec. 12.21, at 903 (1973); Restatement (Second) of Contracts sec. 348(1), comment b, at 120 (1979).) In Fisher's case there was no limited period of delay but a complete cessation of activity with regard to the property by both owner and contractor. We do not understand that the remedy for delay applies to such an open-ended situation.

Fisher is entitled to compensation but not a windfall. (*Community Consolidated School District No. 169 v. Meneley Construction Co.* (1980), 86 Ill. App. 3d 1101, 409 N.E.2d 66.) In *Ross v. Danter* (1968), 102 Ill. App. 2d 354, 242 N.E.2d 330, the court provided an example to illustrate the proper measure of damages:

> "Suppose a contractor has agreed to build a building for an owner for $400,000.00. Suppose further the contractor has partially constructed the building and has received $200,000.00 and at this point refuses or is unable to continue the contract and is hence in breach of contract. Suppose also that at this point the reasonable cost of completing the building would be $300,000.00. In determining the damages sustained by the owner, the cost of performance would be first the amount paid

to the contractor, $200,000.00 plus the cost of completion, $300,000.00 or a total of $500,000.00. The difference between this amount, $500,000.00 and the contract price $400,000.00 or $100,000.00 would be the damages sustained by the owner. \*\*\* The rule as so applied gives due effect to the partial performance by both contractor and owner \*\*\*."

In *Yonan v. Oak Park Federal Savings & Loan Association* (1975), 27 Ill. App. 3d 967, 326 N.E.2d 773, the cost of construction at the time of entry of the decree was properly considered in applying the rule established in *Ross*, although at least six years had passed between the breach and the decree. In the present case, Fisher paid out more than $13,000 at Mid-Central's direction. A contractor estimated that the 1983 cost of completion was approximately $44,000. Although it is not clear whether $44,000 includes items not contemplated in the original contract, it is apparent that the 1983 cost of completion will exceed the contract price. We therefore remand for a determination of the completion cost of the building Mid-Central agreed to build for Fisher and the extent of Fisher's damages.

■ The partially completed building has deteriorated, and materials have disappeared from the site. Fidelity contends that Fisher may recover nothing because he failed to mitigate his damages by securing or preserving the property. However, the rule in Illinois is that the plaintiff may not increase the measure of damages by his failure to mitigate the harm to his property. (*Montefusco v. Cecon Construction Co.* (1979), 74 Ill. App. 3d 319, 392 N.E.2d 1103.) Failure to mitigate damages is an affirmative defense and must be pleaded and proved by the defendant. Having failed to plead this affirmative defense, Fidelity cannot now complain of Fisher's conduct. *Rozny v. Marnul* (1969), 43 Ill. 2d 54, 250 N.E.2d 656.

■ Should Fisher's damages exceed the amount of the bond, Fidelity's liability is nevertheless limited to the terms of its undertaking. In *Turk v. United States Fidelity & Guaranty Co.* (1935), 361 Ill. 206, 197 N.E. 765, the contractor agreed to move a building belonging to Turk. The contractor obtained a performance bond in the full amount of the contract. The underlying contract gave the owner the right to complete the work, making the contractor liable for any or all damages beyond the contract price. But the surety's liability did not include any or all damages. The court determined that "[t]he liability of the defendant as surety, *within the limit of the principal sum of the bond*, is coextensive with that of the contractor. \*\*\*." (Emphasis added.) (*Turk v. United States Fidelity & Guaranty Co.* (1935), 361 Ill. 206, 212, 197 N.E. 765, 767.) More recently, in a suit upon a per-

formance bond, the extent of the surety's liability was limited to the penal sum even when the principal's liability was greater. *Griffin Wellpoint Corp. v. Engelhardt, Inc.* (1980), 92 Ill. App. 3d 252, 414 N.E.2d 941. See also *United Mail Order, Warehouse & Retail Employees Union, Local 20 v. Montgomery Ward & Co.* (1956), 9 Ill. 2d 101, 137 N.E.2d 47, *cert. denied* (1957), 352 U.S. 1002, 1 L. Ed. 2d 546, 77 S. Ct. 558.

■ It was not error to award prejudgment interest to Fisher. Where there is suit upon a bond it is sufficient to show that it was a bond sued upon and that the money was due. Interest is properly allowed from the date of suit. (*Griffin Wellpoint Corp. v. Engelhardt, Inc.* (1980), 92 Ill. App. 3d 252, 414 N.E.2d 941; *County of Will v. Woodhill Enterprises, Inc.* (1971), 4 Ill. App. 3d 68, 274 N.E.2d 476.) In this case, Fisher's suit as obligee on the bond against Fidelity was filed on February 1, 1976.

For all the reasons stated above, we affirm the trial court's judgment as to Fidelity's liability and award of prejudgment interest as well as damages pursuant to section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1983, ch. 73, par. 767) but reverse the award of lost net rental income and $25,000 in punitive damages. We remand for a determination of Fisher's damages and prejudgment interest in accordance with the views expressed herein.

Affirmed in part; reversed in part; remanded.

WELCH, P.J., and KASSERMAN, J., concur.