**RUSH PRESBYTERIAN ST. LUKE'S MEDICAL CENTER, Plaintiff,**

v.

**SAFECO INSURANCE COMPANY OF AMERICA, et al., Defendants.**

**WINDOWMASTER CORPORATION, et al., Plaintiffs,**

v.

**MORSE/DIESEL, INC., et al., Defendants.**

**Nos. 85 C 8998, 87 C 2854.**

United States District Court, N.D. Illinois, E.D.

Sept. 28, 1989.

Robert J. Schuckit, Keck, Mahin & Cate, Chicago, Ill., for Windowmaster.

T. Scott Leo, Pretzel & Stouffer Chtd., Chicago, Ill., for Safeco.

Peter Petrakis, Katten, Muchin & Zavis, Chicago, Ill., for Morse/Diesel.

John McGinnis, Altheimer & Gray, Chicago, Ill., for Rush Presbyterian.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Motion by motion, ruling by ruling, these cases inch closer to resolution. In the wake of various rulings on motions to dismiss and motions for summary judgment, see *Rush Presbyterian St. Luke's v. Safeco Ins. Co.*, 712 F.Supp. 1344 (N.D.Ill.1989), the parties have inundated the court with more motions for summary judgment and—a sure sign that a trial looms—motions in limine. The court will address the motions for summary judgment first.

*Morse/Diesel's Motion for Summary Judgment*

In its previous opinion, the court granted Morse/Diesel, Inc. summary judgment on a portion of Count 1 of Safeco Insurance Company of America's Cross–Claim. See *id.* at 1348–49. Encouraged by its earlier victory, Morse/Diesel now seeks summary judgment on Count 2 of Safeco's Cross–Claim. While this court perceives no link between its earlier ruling and the decision which it renders now, Morse/Diesel is succeeding in reducing Safeco's claims against it.

█ In Count 1 of Safeco's Cross–Claim, Safeco alleged that Morse/Diesel owed Safeco a duty to monitor payments to Morse/Diesel's subcontractor, Windowmaster Corporation, prior to Morse/Diesel's declaring Windowmaster in default of its subcontract. In Count 2, by contrast, Safeco alleges harm occurring after Morse/Diesel declared default. Safeco alleges further in Count 2 that Morse/Diesel owed it a more rigorous duty of supervising Windowmaster after the default than before the default. Morse/Diesel makes the same argument against Count 2 as it did against Count 1: it had no duty to Safeco.

Resolving the parties' dispute over Count 2 requires less looking at the parties' contracts and more looking at the parties' pleadings. In its brief in opposition to Morse/Diesel's motion, Safeco claims that Morse/Diesel's duty to supervise Windowmaster stemmed from three sources: a July 16, 1981 letter Agreement incorporating the terms of Windowmaster's subcontract with Morse/Diesel, Morse/Diesel's review and endorsement of Windowmaster's work tickets after the Letter Agreement, and a second Letter Agreement dated March 12, 1982. What is curious is that Safeco pleaded this in Count 2:

19. MORSE/DIESEL, INC. of Illinois breached Article XVI of the General Conditions [1] by failing to process or accept written notices for change orders from SAFECO during the completion of [Windowmaster's] curtainwall subcontract work and by failing to allow price adjustments to the contract price for work outside the scoep [sic] of the original curtainwall subcontract.

While Safeco acknowledged the Letter Agreements in its Cross–Claim, see ¶ 18, its pleadings never elevated them or Morse/Diesel's post-July 1981 activities to the level of a contract creating the duties claimed here. If Safeco wishes to amend Count 2 to allege a different source of obligation other than Article XVI of the General Conditions, it should so move. This court will not allow Safeco to amend its pleadings absent a motion. See *Federal Deposit Ins. Corp. v. Linn*, 671 F.Supp. 547, 564 n. 43 (N.D.Ill.1987) (citations omitted) ("litigants' efforts to paper over pleading deficiencies in their legal memoranda are all too common, but nevertheless inherently improper.")

This said, the court finds that Morse/Diesel is entitled to summary judgment on Count 2, as Safeco has pleaded it. One searches in vain, in Safeco's memorandum in opposition to Morse/Diesel's motion, for an explanation as to how Article XVI of the General Conditions created the duties

---

1. Of the Rush Presbyterian St. Luke's Medical Center Construction Agreement. See *id.* at 1348.

which Morse/Diesel allegedly breached. It is not obvious from Article XVI how Morse/Diesel owed Safeco such duties, and the court will not speculate as to how Safeco interprets the article. Accordingly, this court enters summary judgment in favor of Morse/Diesel on Count 2 of Safeco's Cross–Claim.

*Safeco's Motion For Summary Judgment on Windowmaster's Complaint*

In its prior ruling, the court granted Safeco's motion to dismiss Count 5 of Windowmaster's [2] Third Amended Complaint for failure to state a claim upon which this court could grant relief. See *Rush*, 712 F.Supp. at 1346–48. Safeco now moves for summary judgment on Counts 1 and 3 of the Third Amended Complaint.

■ Safeco's first contention is that Windowmaster does not have standing to bring Count 1, its prayer for a declaration that Windowmaster has no obligation to Safeco to pay sums expended by Safeco in completing the Rush project, or Count 3, a claim that Safeco breached its duty of good faith under a General Indemnity Agreement. Safeco rests this argument upon a provision of the bond which Safeco issued in favor of Morse/Diesel, a bond which the General Indemnity Agreement covered. That provision stated: "No right of action shall accrue on this bond to or for the use of any person or corporation other than [Morse/Diesel] or the heirs, executors, administrators or successors of [Morse/Diesel]."

In previous opinions, this court has applied Illinois law to Safeco and Windowmaster's dispute over the duties imposed by the General Indemnity Agreement. See, for example, *Rush*, 712 F.Supp. at 1345. Under Illinois law, indemnity contracts are construed as any other contract, and the Illinois courts usually construe the language of contracts according to their plain meaning. See *Plepel v. Nied*, 106 Ill.App.3d 282, 290–91, 62 Ill.Dec. 197, 204, 435 N.E.2d 1169, 1176 (1984); *Montgomery Ward & Co. v. Wetzel*, 98 Ill.App.3d 243, 251, 53 Ill.Dec. 366, 373, 423 N.E.2d 1170,

1177 (1981); *National Bank v. West Construction Co.*, 41 Ill.App.3d 686, 689, 355 N.E.2d 43, 47 (1976). Here, the "no-action" provision of Safeco's bond is limited to the bond itself, and not the General Indemnity Agreement. Safeco has given this court no reason why it should expand the limitation beyond the bond, and thus Windowmaster has standing to assert its claims under Counts 1 and 3.

■ Safeco's remaining attacks apply only to Count 3. Safeco first argues that § 155(1) of the Illinois Insurance Code, Ill. Rev.Stat. ch. 73, § 767(1) (1987), preempts Count 3. Section 155(1) reads:

In any action by or against a company wherein there is in issue the liability of a company on a policy ... of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious or unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:....

Safeco rests its argument for preemption on the holdings of cases such as *Kush v. American States Ins. Co.*, 853 F.2d 1380 (7th Cir.1988), and *Barr Co. v. Safeco Ins. Co. of America*, 706 F.Supp. 616 (N.D.Ill. 1989). In *Kush*, the Seventh Circuit held that § 155(1) preempted an insured's claim that his insurer intentionally inflicted emotional distress upon him for refusing to cover or defend the insured in a lawsuit. The court reasoned that § 155(1) preempted " '*any* count alleging nothing more than the conduct proscribed by section 155....' " *Id.* at 1385, quoting *Combs v. Insurance Co.*, 146 Ill.App.3d 957, 964, 100 Ill.Dec. 525, 530, 497 N.E.2d 503, 508 (1986) (emphasis in *Combs*). In *Barr*, Judge Moran noted that the Illinois doctrine supporting preemption was that "courts should not implement or expand by judicial decree remedies already provided by the legislature." The judge thus held that

---

**2.** Hereafter, when the court refers to "Windowmaster," the court speaks of Windowmaster Corporation and its principals, Nathan and Bernice Walberg.

§ 155(1) preempted an insured's common-law claims for the tort of willful and wanton misconduct and breach of the covenant of good faith and fair dealing, brought against an insurer who allegedly delayed payment on a claim. *Barr,* 706 F.Supp. at 617–18.

Careful analysis of § 155(1) reveals that it covers three types of cases: those involving (1) an issue of the liability of the insurance company under a policy; (2) an issue regarding the amount of loss payable under a policy; and (3) allegations of unreasonable delay in settling a claim. Section 155(1) does not preempt claims that allege items in addition to or exclusive of these. See *Kush,* 853 F.2d at 1385 (plaintiff can bring claims on conduct other than that covered in § 155(1)); *National Union Fire Ins. v. Continental Illinois,* 673 F.Supp. 267, 270–72 (N.D.Ill.1987) (claims of improper refusal to settle fall outside of three categories covered by § 155(1)); *Verlan, Ltd. v. John L. Armitage & Co.,* 695 F.Supp. 955, 957–58 (N.D.Ill.1988) (same).

Windowmaster's allegation that Safeco improperly settled Morse/Diesel's claims does not fit into any of § 155(1)'s categories. Safeco's duties to Windowmaster stem from its surety/principal relationship, not the bond which Safeco issued pursuant to that relationship. This makes § 155(1)'s first two categories inapplicable here. As for the third category, claims of unreasonable delay in settlement, the courts in *National Union* and *Verlan* held that this category relates solely to claims by the insured that the insurer unreasonably delayed in settling claims of the insured with the insured. Suits involving the insurer's conduct in settling with third parties do not fall within this category. See *National Union,* 673 F.Supp. at 270–72; *Verlan,* 695 F.Supp. at 957–58.

While not attacking *National Union* and *Verlan* directly, Safeco argues that this interpretation of § 155(1) is absurd. If a surety vexatiously delays paying or settling with an obligee, § 155(1) limits the obligee's damages. See, for example, *Fisher v. Fidelity Deposit Co. of Maryland,* 125 Ill.App.3d 632, 640–41, 80 Ill.Dec. 880, 887, 466 N.E.2d 332, 339 (1984). By contrast, if the same vexatious delays harm the principal, the principal can sue the surety and disregard § 155(1)'s cap, under the reasoning of *National Union* and *Verlan.* Safeco believes that it is absurd for two parties to recover different damages for the same act of misconduct.

What Safeco does not understand is that a single act of misconduct by a surety can affect the principal and the obligee in different ways. If the surety fails to settle a case in a reasonable manner, the obligee still has the right to seek recovery of the amount of the surety's obligation. The delay in settlement results only in a loss to the obligee of the time value of the amount of the settlement; since consequential damages usually are too speculative for courts to grant, § 155(1) provides an approximation of the additional damages suffered by the obligee. See *National Union,* 673 F.Supp. at 271 (§ 155(1) eliminates the problem of estimating consequential losses to insured in failing to settle in a reasonable time). By contrast, when a surety fails to settle at a reasonable amount—regardless of when the settlement offer is made—the surety exposes his or her principal to the risk of loss in excess of the surety's contractual limit. As the *National Union* court pointed out in an analogous case, the damage to the principal in this instance "is truly direct rather than consequential—it is clearly measurable (in terms of the [obligee's] excess recovery over the [contractual] limits) and poses no arcane proximate cause issues...." *Id.*

The different rights of principals and obligees under Illinois law with respect to a surety's duty to settle claims are understandable and rational. While this case does not involve an unreasonable delay in settlement—to the contrary, Windowmaster contends that Safeco settled too quickly —Windowmaster's alleged damages are nonetheless as direct and foreseeable as they would have been had Safeco refused to settle at all. Allowing Windowmaster to recover for those damages does not undercut the policies behind § 155(1), and its claim falls outside of that statute's express categories. Section 155(1) thus does not

preempt Count 3 of the Third Amended Complaint.

Safeco's last contention is that Windowmaster has not proven damage from Safeco's alleged breach. Some of Safeco's arguments stem from the court's prior criticism of Windowmaster's alleged damages under Count 5, which the court dismissed. See *Rush*, 712 F.Supp. at 1347–48 (discussing various problems in relating claimed damages to Safeco's alleged misconduct). All of the items of damage alleged in former Count 5 are alleged in Count 3; some of them are as insufficient under Count 3 as they were under Count 5. See Third Amended Complaint, ¶ 48(b) (damages stemming from Safeco's Cross–Claims); *id.* at ¶ 48(c) (damages resulting from Morse/Diesel's delay in payment); *id.* at ¶¶ 48(a), 48(d) (sums due under Windowmaster's subcontract prior to Morse/Diesel's decision to terminate Windowmaster from the Rush project).[3]

Safeco asserts that Windowmaster's other items of damage are likewise insufficient. The court agrees with Safeco, but only in part, and the part which survives Safeco's argument is enough to allow Windowmaster to proceed to trial with Count 3.

■ In opposing Safeco's motion, Windowmaster brings forth three items of damage. Windowmaster first contends damage by reason of an agreement to pay $460,000 to Parnell International Iron Works. While this will not be the last mention of Parnell—the company reappears in Safeco's other motion for summary judgment—Windowmaster fails to allege how its mere agreement to pay Parnell resulted in damage. The court can infer from Safeco's response to Windowmaster's allegation that Windowmaster paid something to Parnell; Windowmaster can recover this amount if Safeco's breach resulted in this payment. Signing a contract, however, usually is not harmful.

■ Windowmaster's second item of damage is lost profits on account of its inability to obtain bonds on other projects. Windowmaster does not dispute Safeco's submission that, under Illinois law, Windowmaster can recover for items like this one if "they were reasonably forseeable, were within the contemplation of the parties at the time the contract was entered, or arose out of special circumstances known to the parties." *Mohr v. Dix Mutual County Fire Ins. Co.*, 143 Ill.App.3d 989, 996, 97 Ill.Dec. 831, 837, 493 N.E.2d 638, 644 (1986).

Windowmaster argues that it was reasonably forseeable that Safeco's breach would result in Windowmaster not obtaining bonds on other projects. Windowmaster points to two things as proof that the parties foresaw these damages: the common-law duty imposed on sureties, and Safeco's reservation in the General Indemnity Agreement of its right to decline any bond. Neither of these things demonstrates (or even creates a genuine dispute) that the parties reasonably forsaw lost profits from other work. As noted in this court's opinion in *Windowmaster Corporation v. Morse/Diesel, Inc.*, 1988 WL 142211, 1988 U.S.Dist. LEXIS 14921 (N.D. Ill. Dec. 29, 1988), Illinois law impresses a duty upon sureties to settle claims in good faith in order to reduce the risk of loss to the principal from the *claim*. Were it not for this risk, the law would not impose the duty. As for Safeco's reservation of the right to refuse to bond a project, the court cannot reasonably infer from this provision that Safeco foresaw liability from other

---

**3.** Windowmaster's treatment of pre-termination damages under ¶¶ 48(a) and (d) is confusing. On the one hand, Windowmaster admits in its *Response to Motion of Safeco Insurance For Summary Judgment on Counts I and III* that "Plaintiffs' claims for damages for sums due under the subcontract prior to termination are the responsibility of the parties to that subcontract and culpable parties defendants Rush and Morse/Diesel.... Plaintiffs['] damages for pre-termination sums due and work outside the scope of the subcontract are recoverable from Rush and Morse/Diesel, not Safeco." Response, 7–8. On the other hand, Windowmaster *seems to suggest that Safeco owes it $406,-030.27,* the outstanding balance under the subcontract at the time of termination. *Id.* at 2–3. This court will take Windowmaster's express acknowledgement of Safeco's lack of pre-termination liability over its innuendo to the contrary.

companies' failures to bond, nor has Windowmaster submitted evidence to the contrary. Windowmaster thus cannot recover under Count 3 for lost profits on other projects.

■ Windowmaster's last item of damage is for work done after Morse/Diesel terminated it from the Rush project. Windowmaster claims a post-termination loss of $436,299.27. Its method of calculating this sum baffles the court.[4] Nevertheless, Safeco seems to acknowledge that Windowmaster has alleged out-of-pocket expenses in the post-termination period; if Windowmaster can quantify and link these expenses successfully at trial to Safeco's misconduct, Windowmaster can recover them.

*Safeco's Motion for Summary Judgment on its Counterclaim Against Windowmaster*

Safeco asks this court to grant summary judgment on its counterclaim against Windowmaster in the amount of $859,474.89. Safeco derives this figure from $417,376.89 in payments which Windowmaster made to various subcontractors from a trust fund established in December 1981. Windowmaster and Safeco set up this fund in order to allow Windowmaster to complete its curtainwall work after Morse/Diesel declared Windowmaster in default. The remaining amount for which Safeco seeks judgment, $442,098.00, is equal to what Safeco paid to Parnell—payments which, under the agreement mentioned earlier, Windowmaster was supposed to make.

■ Safeco asserts that Windowmaster owes these amounts under the General Indemnity Agreement, and that this court should estop Windowmaster from denying liability for them. The parties tacitly agree once again that Illinois law governs this dispute. The parties explicitly agree that under this law, a party is estopped from asserting rights under a contract when the

party conducts himself or herself voluntarily, and another party in good faith acts in reliance upon such conduct to the other party's detriment. See *Searcy v. Chicago Transit Authority*, 146 Ill.App.3d 779, 783, 100 Ill.Dec. 432, 434–35, 497 N.E.2d 410, 412–13 (1986); *Tyska v. Board of Education*, 117 Ill.App.3d 917, 930, 73 Ill.Dec. 209, 220, 453 N.E.2d 1344, 1355 (1983). The party who asserts estoppel bears the burden of proof; that proof must be " 'clear, precise and unequivocal.' " *City of Chicago v. Nielsen*, 38 Ill.App.3d 941, 947, 349 N.E.2d 532, 539 (1976), quoting *Jennings v. Bituminous Casualty Corp.*, 47 Ill.App.2d 243, 249, 197 N.E.2d 513, 517 (1964).

Windowmaster concedes that Safeco acted to its detriment by allowing payments from the trust fund and by paying Parnell. Windowmaster disputes, however, whether Safeco relied in good faith upon Windowmaster's apparent assent to these payments, and whether Windowmaster gave assent voluntarily. Windowmaster's argument about Safeco's good faith forms the core of Windowmaster's own claims against Safeco. Needless to say, Safeco and Windowmaster dispute several issues of material fact with respect to Safeco's good faith in settling Morse/Diesel's claims; that dispute prevents Safeco from benefitting from estoppel at this time.

■ The foregoing would be enough to prevent this court from entering summary judgment on Safeco's counterclaim. The court will dispose of Windowmaster's claim of involuntary conduct in order to narrow the issues for trial. As the court in *People ex rel. Carpentier v. Treloar Trucking Co.*, observed, 13 Ill.2d 596, 600, 150 N.E.2d 624, 626 (1958), "Conduct under duress always involves a choice, but ... the making of a choice under such circumstances does not estop the person acting under duress from later asserting his rights." Windowmaster asserts that it acted under

4. Windowmaster asserts that the $436,299.27 figure comes from $253,000 which Windowmaster paid to complete the Rush project and $182,-417, the unpaid balance on a subcontract after payments to Parnell. Most people adding these numbers would obtain a sum of $435,417. Its

puzzling math aside, Windowmaster presents no facts substantiating the $182,417 amount. The court questions further whether this sum stems from Safeco's post-termination conduct. See note 3 above.

duress because Safeco took advantage of Windowmaster's weakened financial condition to extract its approval of payments. Windowmaster also claims duress as a result of a Safeco threat to file suit.

Generally, the burden of proving duress is on the person asserting it. See *Stoltze v. Stoltze*, 393 Ill. 433, 442, 66 N.E.2d 424, 428 (1946). As noted earlier, however, the party asserting estoppel bears the burden of proving its elements, and thus Safeco has the burden of proving that Windowmaster acted voluntarily. This said, Windowmaster's actions as a matter of law were voluntary, notwithstanding Safeco's alleged lack of good faith in relying upon them. As the court observed in *Enslen v. Village of Lombard*, 128 Ill.App.3d 531, 533, 83 Ill. Dec. 768, 770–71, 470 N.E.2d 1188, 1190–91 (1984) (citations omitted):

> Duress does not exist ... where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances unless the conduct of the party obtaining the advantage is shown to be tainted with some degree of fraud or wrongdoing. Nor is it duress to threaten to institute civil suits, or to declare that one intends to use the courts to insist upon what he believes to be his legal rights, at least where the threatened action is made in the honest belief that a good cause of action exists, and does not involve some actual or threatened abuse of process.

Taking Windowmaster's allegations as true,[5] Windowmaster has not argued that Safeco produced Windowmaster's weak financial condition at the time it entered into the Parnell agreement. Nathan Walberg attributes his company's condition to Morse/Diesel's termination from the Rush project; Windowmaster never claims that Safeco was responsible for this decision. As for Safeco's threat of suit, Windowmaster does not allege that Safeco made its threat (upon which Safeco made good) in the absence of a good faith belief that it

had a valid cause of action—which in fact Safeco has. Windowmaster also has not alleged that Safeco has abused legal process. Windowmaster thus cannot defeat Safeco's case for estoppel by arguing duress.

### Motions in Limine [6]

■ All of the motions in limine are against Windowmaster. The first concerns evidence relevant to Windowmaster's claims against Morse/Diesel and Rush for damage on account of delays. See Third Amended Complaint at ¶ 48(c). Windowmaster replies that it does not seek damages on account of the delays, but rather it wishes to use evidence of the delays to establish its claim of breach of contract. The court will hold Windowmaster to its word. Morse/Diesel and Rush suggest, however, that the court should not allow Windowmaster to do even this. They direct the court to Art. XXVI, ¶ VI, of the General Conditions of the Rush project, which Windowmaster's subcontract incorporated. There Windowmaster "expressly agrees not to make, and hereby waives any claim for damages, including those resulting from increased labor or material costs, on account of any delay, obstruction or hindrance for any cause whatsoever ... and agrees that the sole right and remedy therefor shall be an extension of time."

The court does not find in this paragraph anything which forecloses use of evidence of delays. That Windowmaster did not seek an extension of time is probative evidence that no delays occurred, or that they were not harmful to Windowmaster. Similarly, evidence of actions which may have resulted in a delay are probative if they amounted to a breach of contract, independent of the delay. Morse/Diesel and Rush demonstrate no undue prejudice which would result from introducing this evidence, and so the court will allow it. See Rules 402–03, Fed.R.Evid.

The next motion, which is principally Morse/Diesel's but which includes Rush in

**5.** Safeco disputes them, of course.

**6.** The briefs on the motions in limine are inferior to those on the motions for summary judgment, both in quality of legal argument and in their professionalism. While the attorneys may be impressed with or influenced by their opponents' rancor and rhetoric, the court is not.

part, relates to Windowmaster's other items of damage. Morse/Diesel first argues that it is not responsible for any damages which Windowmaster seeks under its subcontract with Rush prior to termination of the subcontract in July 1981. Morse/Diesel directs the court to its opinion in *Rush,* 712 F.Supp. at 1348, where the court held that "[n]o clause in the General Conditions obligates Morse/Diesel to screen or otherwise approve of payments to subcontractors like Windowmaster."

This statement provides nothing more than rhetorical support for Morse/Diesel's motion. In *Rush,* the question before the court was whether Morse/Diesel owed a duty to Rush (and by extension, Safeco) to approve or screen Rush's payments to subcontractors. The court did not decide whether Morse/Diesel owed duties to its subcontractors—indeed, the court would be shocked to learn that Morse/Diesel owed no duties whatsoever to its subcontractors.

■ Nevertheless, the court is not inclined to hear Windowmaster's evidence about Morse/Diesel's duty to pay for work completed on the subcontract prior to its termination. Windowmaster points to only two sources for Morse/Diesel's obligations to pay for this work. Neither source reflects the claimed duty. Windowmaster first suggests that because Morse/Diesel "paid" Windowmaster on prior occasions, Morse/Diesel took on a duty to pay Windowmaster for all of its work. Yet as the court noted in *Rush, id.,* Morse/Diesel was obligated to pass on payments received from Rush for the account of Windowmaster to Windowmaster. That Morse/Diesel satisfied this obligation does not suggest it owed a broader duty to Windowmaster to pay for services rendered to Rush. Similarly, Windowmaster has pleaded and Nathan Walberg has testified that Morse/Die-

sel failed to approve and accept work in a timely manner. Setting aside for the moment the deficiency of these proofs,[7] these failures do not reflect Morse/Diesel's alleged duty either. At most, they suggest a breach of a promise to approve and accept work in a timely manner, the remedy for which (as the parties provided in their contract) is an extension of time. See above. Based on what it has seen, the court will not allow Windowmaster to introduce evidence against Morse/Diesel that it owes Windowmaster money for services rendered under the Rush subcontract prior to its termination.

Morse/Diesel and Rush argue next that they are not liable for costs related to work performed after termination of the Rush subcontract in July 1981. While Windowmaster correctly notes that damages for breach of contract may accrue and be recovered after termination of the contract, there still must be a contract. So far, Windowmaster has shown promises to pay for services rendered only from Rush, not Morse/Diesel. Evidence relating to a breach of a promise to pay for such services would be admissible against the former, but not the latter.

■ Morse/Diesel and Rush's third argument is against evidence relating to Windowmaster's claims of lost profits on other projects, on account of not being able to receive bonding. The court noted earlier the Illinois rule that contract damages must be reasonably forseeable, either because the parties contemplated them at the time the parties entered the contract or because the parties were aware of special circumstances giving rise to the item of damage. While Windowmaster has evidence that it could not obtain bonding once Rush or Morse/Diesel terminated its sub-

---

7. As the party offering evidence, Windowmaster bears the burden of demonstrating its relevancy. See Rule 402, Fed.R.Evid. An allegation in a pleading does not serve as proof of the matter alleged. Nathan Walberg's testimony that Morse/Diesel owed Windowmaster a duty to pay is a self-serving conclusion, and is worthy of disregard much like Windowmaster's pleading. What Windowmaster needs to prove the duties which Morse/Diesel owed to it is evidence of a promise. Windowmaster offered evidence of a promise in trying to justify its use of an expert on the issue of custom and usage. See above. The court will take notice of Morse/Diesel's promises in the Windowmaster subcontract when considering the present motion, even though Windowmaster failed to present this evidence in opposition to this motion.

contract, Windowmaster has not presented evidence that the parties contemplated losses stemming from lack of bonding at the time they entered into the subcontract. Based on the evidence presented to date, Windowmaster may not recover damages under Illinois contract law for loss of business resulting from lack of bonding.[8]

█ Rush and Morse/Diesel lodge their final objection to Windowmaster's damage items against Windowmaster's prayer for attorneys fees and costs. Windowmaster acknowledges the general rule in Illinois that a party may not recover attorneys fees and costs from the losing party unless the parties promise to pay such fees or a statute so provides. See *Bd. of Educ. v. Ill. State Bd. of Educ*, 122 Ill.App.3d 471, 473, 77 Ill.Dec. 944, 946, 461 N.E.2d 567, 569 (1984). Windowmaster claims that it seeks attorneys fees and costs not on account of its expectation that it will prevail in this suit, but because such costs are items of damage resulting from Rush and Morse/Diesel's misconduct. Illinois allows a party to recover attorneys fees and costs when the party has incurred them "in actions with third parties brought about by [the] defendant's misconduct...." *Nalivaika v. Murphy*, 120 Ill.App.3d 773, 776, 76 Ill.Dec. 341, 343, 458 N.E.2d 995, 997 (1983). See also *Sorenson v. Fio Rito*, 90 Ill.App.3d 368, 372, 45 Ill.Dec. 714, 718–19, 413 N.E.2d 47, 51–52 (1980).

Based on the parties' submissions to date, the court is not inclined to allow Windowmaster to recover attorneys fees and costs. This is because Windowmaster has not indicated whose wrongful act caused it to have to litigate with someone else. Windowmaster proclaims that the evidence at trial will straighten this out, but the court will not allow Windowmaster to get this evidence to trial unless Windowmaster can show how this case fits within the Illinois exception to the "American Rule" on attorneys fees.

█ So much for the motions in limine on damages. The next motion comes from Morse/Diesel, which asks the court to bar Windowmaster from introducing evidence of customs and usages in the construction industry. Under Illinois law, evidence of custom and usage in an industry is admissible to explain the terms or provisions of ambiguous contracts, see *Bean v. Norfolk & Western Ry. Co.*, 84 Ill.App.3d 395, 400, 39 Ill.Dec. 665, 673, 405 N.E.2d 418, 426 (1980), or to supplement the terms of a contract where there is no provision in the contract regarding the subject to the contrary, see *Fifteenth Ave. Christian Church v. Moline Heat*, 131 Ill.App.2d 766, 769, 265 N.E.2d 405, 408 (1970). A party's suggestion that something is a custom or usage, however, is insufficient to put evidence relating to it in play. The custom or usage must be " 'so uniform, long-established and generally acquiesced in and so well known as to induce the belief that the parties contracted with reference to it....' " *Clark v. General Foods Corp.*, 81 Ill.App.3d 74, 78, 36 Ill.Dec. 447, 451, 400 N.E.2d 1027, 1031 (1980), quoting *Kelly v. Carroll*, 223 Ill.App. 309, 315–16 (1921).

Applying this law to the facts presented so far, the court could bar Windowmaster from introducing evidence of custom or usage. While Windowmaster has indicated some portions of the General Conditions and its subcontract which are ambiguous or silent on issues on which Windowmaster would like to offer expert testimony, Windowmaster has not yet offered evidence that its claimed custom is well-established, uniform, and generally acquiesced in. It is preferable to establish the claimed custom or usage by the testimony of several witnesses, see *Ledbetter v. Crudup*, 114 Ill. App.3d 401, 403, 70 Ill.Dec. 391, 393, 449 N.E.2d 265, 267 (1983), although the court could envision a suitable expert testifying in lieu of several witnesses. Until Windowmaster better satisfies the court on this point,[9] the court is inclined to bar any testi-

---

**8.** As a result of this ruling, Windowmaster may not present the expert testimony of D.W. "Duff" Matson, III on this subject.

**9.** Windowmaster intends to call Calvin Zemsky, a forensic engineer, on the issue of custom and usage. While Windowmaster has satisfactorily established Zemsky's expertise in forensic engineering, it has not demonstrated how he quali-

mony about customs and usages in the construction industry.

 The final two motions are related. One is from Rush, which seeks to bar testimony offered by Windowmaster about any act or omission of any entity other than Morse/Diesel in support of its claim for breach of contract against Rush. The other is from Rush, Morse/Diesel, and Safeco, which seek to bar testimony pertaining to three volumes of a report prepared by Calvin Zemsky, Windowmaster's expert, or opinions expressed in those volumes. Zemsky's report details how changes in sequencing and delays in the awarding of the Windowmaster subcontract, the review of drawings, and approval of mock-ups hampered Windowmaster's work. All of these problems were allegedly out of Windowmaster's hands. Zemsky attributes them to Rush's architects (Hansen, Lind, Meyer and Solomon, Cordwell & Buenz), its curtain wall consultants (Heitman & Associates), and its representative (Schal Associates).

Windowmaster seeks to make Rush responsible for the actions of these entities. The difficulty which Windowmaster encounters, however, is its own pleadings. In Count 4 of Windowmaster's Third Amended Complaint—Windowmaster's only claim against Rush—Windowmaster alleges: "Despite the fact that WINDOWMASTER had well and faithfully performed all of its obligations ... under the subcontract, nevertheless RUSH–PRESBYTERIAN through its agent MORSE/DIESEL breached its agreements with WINDOWMASTER in numerous particulars then known to it, including but not limited to the following...." Third Amended Complaint at ¶ 50. Simply put, Count 4 attributes liability to Rush for the acts of only one agent, Morse/Diesel, and no others.

Windowmaster never argues that Count 4 encompasses the acts of Rush's other agents. It instead requests leave to amend its complaint, and so the court will consider this issue under Rule 15(a), Fed.R.Civ.P.

This rule provides that the court should grant leave to amend a complaint "freely ... when justice so requires." The rule states a liberal policy of amendment, such that it is the burden of the party opposing amendment to show how amendment would result in undue prejudice to that party—prejudice which could have been avoided had amendment occurred sooner. See *In re Olympia Brewing Co. Securities Litigation*, 674 F.Supp. 597, 605–06 (N.D.Ill. 1987); *Lanigan v. LaSalle Nat. Bank*, 108 F.R.D. 660, 662 (N.D.Ill.1985); *Conroy Datsun Ltd. v. Nissan Motor Corp. in U.S.A.*, 506 F.Supp. 1051, 1054 (N.D.Ill. 1980).

Rush claims that it will suffer prejudice if Windowmaster amends its complaint because there is insufficient time to conduct discovery on the actions of entities other than Morse/Diesel. Windowmaster, on the other hand, insists that discovery is complete, and calls the court's attention to numerous depositions where Windowmaster has complained about these entities.

Perhaps discovery is complete for Windowmaster, but the question here is whether Rush has had sufficient discovery. Rush insists that it has tailored its discovery to what Windowmaster has pleaded against it, and not to every accusation that Windowmaster has raised in numerous depositions (often without Rush present) over the years. Based on the parties' filings on this motion, the court finds that Rush would suffer undue prejudice from amendment of the complaint so close to trial.

The next question is whether this court should hold this prejudice against Windowmaster, and not allow amendment. Windowmaster admits that it could have amended its complaint sooner. Windowmaster filed its first complaint over the Rush fiasco on May 7, 1982 in the Southern District of Florida. That suit named Morse/Diesel, Parnell, and Safeco as defendants. Windowmaster included its present claim against Rush on November 6, 1985.[10]

---

fies as an expert on customs and usages in the construction industry.

**10.** The court hesitates to label this complaint. Some of the pleadings before the Southern District of Florida which include Windowmaster's

Nathan Walberg had testified in depositions in November 1984 and January 1985 —prior to Windowmaster's filing suit against Rush—that architects and consultants on the Rush project had been responsible for delays, but Windowmaster insisted in November 1985 on limiting its pleadings to Rush's vicarious liability for Morse/Diesel's actions. If Windowmaster felt that Rush were indeed responsible for the actions of other entities, it could have brought its claims then. If that were not true enough, Walberg testified in another deposition about these same entities in October 1988. Windowmaster amended its complaint five months later, but again limited its claim against Rush to Rush's liability for Morse/Diesel's actions.

The court finds that Windowmaster has been dilatory in seeking amendment. This is a complex case with many parties. The court has ruled on numerous motions in an effort to narrow the issues for trial, a date for which has been set for some time. Windowmaster now asks the court on the eve of trial for leave to do what it should have done in November 1985, or at the very least March 1989. Accordingly, the court will deny Windowmaster leave to amend its complaint, and will limit Windowmaster's evidence against Rush on Count 4 of Windowmaster's complaint to that relating to Morse/Diesel's conduct.

■■■ Rush, Morse/Diesel, and Safeco, however, want more than this. They want the court to bar any testimony relating to the Zemsky report and the opinions expressed in it. All of these parties claim first that the failures cited in the report were not pleaded. As noted above, this is true with respect to Windowmaster's claim against Rush. As for Morse/Diesel and Safeco, however, a close look at Windowmaster's complaint reveals that when Windowmaster makes it claims against Morse/Diesel, it states that Morse/Diesel breached its agreements with Windowmaster "in numerous particulars then known to it, including *but not limited to*" nine spe-

cific breaches. See Third Amended Complaint at ¶¶ 23, 34 (emphasis added). This language is unlike that of Count 4, which expressly limits Rush's liability to acts committed by Morse/Diesel. If Morse/Diesel was responsible for the actions of the entities faulted in the Zemsky report, and if these actions amounted to a breach of Morse/Diesel's contract with Windowmaster, then Windowmaster can introduce evidence of the failures of these entities against Morse/Diesel. If these actions were among those which Windowmaster reported to Safeco, see *id.* at ¶¶ 38, 40, 44, then Windowmaster can introduce this evidence against Safeco.

■■■ Morse/Diesel and Safeco raise two other objections to the Zemsky report. They contend first that the report impermissibly invades the province of the jury to decide questions of fact and of the province of the court to decide questions of law. While the court is sympathetic to this view, and will make every effort to prevent introduction of improper testimony on the ultimate issues, it is permissible for experts to testify about the customs and usages in an industry, and to amplify the terms of a contract if customs and usages shed light on the meaning of those terms. See Rule 702, Fed.R.Evid. (specialized knowledge admissible to assist trier of fact in determining factual issues); *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1202–03 (7th Cir.1984). Such testimony is distinguishable from that refused in *Loeb v. Hammond*, 407 F.2d 779 (7th Cir. 1969), where plaintiff Loeb offered the testimony of an attorney to testify about the legal significance of language in a contract—something which a federal judge is fully trained to know. Here, it is plausible that Zemsky has specialized knowledge about construction industry practices, and that he can assist the jury in determining what were the implied terms, if any, of the Windowmaster subcontract.

■■■ Finally, Morse/Diesel and Safeco argue that Zemsky's report contains many

claim against Rush refer to this complaint as the "Second Amended Complaint;" other pleadings call it the Third. Similar confusion per-

sists, despite the change in venue, in the pleadings before this court.

statements which are inadmissible, on account of hearsay and the like. While Zemsky can offer his expert testimony and opinion based on matters which might be inadmissible, see Rule 703, Fed.R.Evid., that Zemsky testifies does not make all of the materials upon which he relies admissible for the truth of the matters which they assert. See *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261–62 (9th Cir.1984); *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking*, 576 F.Supp. 107, 158 (D.Del. 1983), aff'd, 740 F.2d 956 (3d Cir.1984). The court must subject the latter evidence to independent analysis before admitting it. See *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1270–71 (7th Cir.1988).

## SUMMARY

The court enters summary judgment in favor of Morse/Diesel on Count 2 of Safeco's Cross–Claim. The court denies Safeco's motions for summary judgment on Counts 1 and 3 of Windowmaster's Third Amended Complaint and on Safeco's Counterclaim against Windowmaster. The court grants Morse/Diesel and Rush's motion in limine on delay damages in part; their motions in limine on other damage items in part; Rush's motion in limine as to evidence of entities other than Morse/Diesel; and the motion in limine to exclude the testimony of D.W. Matson III. The court reserves its ruling on Morse/Diesel's motion in limine on custom and usage, and denies Morse/Diesel and Safeco's motions in limine to bar evidence relating to the Zemsky report.